EUGENE KOTTMEYER, Plaintiff-Appellee, *v.* CONSOLIDATED RAIL CORPORATION, Defendant-Appellant.

Fifth District   No. 79-518

Opinion filed July 17, 1981.

Michael B. Constance and Edward J. Szewczyk, both of Belleville, for appellant.

Maurice E. Bone and Stephen M. Tillery, of Kassly, Bone, Becker, Dix & Tillery, P. C., of Belleville, for appellee.

Mr. PRESIDING JUSTICE KASSERMAN delivered the opinion of the court:

Plaintiff, Eugene Kottmeyer, filed a two-count complaint in the circuit court of St. Clair County against the defendant, Consolidated Rail Corporation, seeking recovery for injuries alleged to have been sustained in a fall on August 29, 1976. Count I asserted negligence under the Federal Employers' Liability Act (45 U.S.C. §§51-60 (1976)); and it was there alleged that at the time of his injury, plaintiff was employed by the defendant for purposes of the Federal Employers' Liability Act (herein-

after FELA). Count II charged common law negligence based on the duty of a landowner to persons on or about its property.

Following a jury trial, a verdict was returned in favor of plaintiff, and damages were awarded in the amount of $175,000. In answer to a special interrogatory, the jury found that the plaintiff had been employed by the defendant at the time of his injury. Judgment was entered on the verdict, and defendant has perfected this appeal.

On appeal, defendant asserts that the trial court erred in refusing to direct a verdict in its favor on count I of the complaint on the grounds that insufficient evidence was submitted to establish that plaintiff was employed by defendant at the time of his injury, as required for recovery under the FELA. The defendant also urges that the trial court erred in its ruling on various evidentiary matters and that the damages awarded by the jury were excessive.

The record reveals that on August 29, 1976, the plaintiff was employed by Pennsylvania Truck Lines, Inc. (hereinafter PTL), which was a wholly owned subsidiary of the defendant, Consolidated Rail Corporation (Conrail). PTL performed two basic services for Conrail. One such service was "ramp" or "yard" work, which consisted chiefly of the loading and unloading of trailers onto and off of railroad flat cars in connection with Conrail's "piggyback" operation. In loading and unloading trailers, PTL employees were required to raise and lower stanchions, climb up and down the flat cars and carry and use various tools. Ramp or yard work also included the performance of minor repairs on stanchions, hand brakes, and railroad cars. It also included the "jockeying" of trailers from one part of the yard to another with yard trucks, which were not permitted to operate on the highways. At the Roselake yard in Fairmont City, Illinois, where plaintiff's alleged injury occurred, only PTL employees performed ramp or yard work. In addition to the ramp or yard work, PTL also performed "street" work, which consisted of the hauling of trailers by truck over the road from one railroad yard to another. There was evidence that, in addition to PTL, 30 to 50 other drayage companies performed street work at the Roselake yard.

Evidence admitted at trial in the form of admissions of fact indicated, among other things, that PTL was a wholly owned subsidiary of Conrail; that the Roselake yards were owned and operated by Conrail; that all of the piggyback cars loaded and unloaded at the Roselake yards arrive and depart on trains owned or operated by Conrail; that PTL was not operating as an independent common-carrier under ICC authority; that under the Regional Rail Reorganization Act of 1973, until title V, section 505, Conrail notified the plaintiff on February 26, 1976, that as an employee of Conrail he was to continue working in the same position, the same location, and the same work that he held as of April 1, 1976 [sic];

that Conrail is the only railroad for which PTL performs terminal services, such as loading and unloading trailers on flat cars; and that Conrail and PTL filed a consolidated income tax return for the years 1977 and 1978.

At trial, Terry Abernathy was called by plaintiff as a witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). Abernathy testified that he was employed by Conrail as terminal manager at the Roselake yard. He further stated that his job entailed supervision of the loading and unloading of railroad flat cars and that he was also in charge of maintenance in the area of the yard where the piggyback operation was conducted.

Abernathy related that his office at the Roselake yard (designated as a "trailvan" office) was located on property owned by the defendant and that the PTL truck garage was also located on the same property. PTL leased the garage from Conrail as well as the property surrounding the garage, according to Abernathy. He estimated that the distance from the "trailvan" office to the PTL truck garage was 100 feet, and he stated that a 40-foot storage trailer was located between those buildings.

The witness further testified that at the time of the plaintiff's injury, a line of timber, consisting of two or three timbers abutting each other, extended from a concrete curbing on one end of the property to a point about four feet from the PTL truck garage. The timbers were 8 to 10 inches high and 8 to 12 inches wide. They were referred to as "bridge timbers"; and, according to Abernathy, they were procured by him from the track department at the request of the PTL manager. Abernathy stated that the timbers were anchored into place with bridge plate rods, which were driven into the ground and bent over the tops of the timbers. Nails were then driven into the top of the timbers and bent over the bridge plate rods.

Abernathy related that the bridge plate rods sometimes came loose when tractors or the wrecker bumped against them. He stated that he had seen the rods loose and protruding above the top surface of the timbers on previous occasions. He also had been informed of loose rods by others and had been asked to get them repaired. On those occasions he informed PTL of the condition, and the rods were repaired two or three times.

Abernathy testified that the PTL employees at the Roselake yard did both ramp work and street work. He stated that PTL put up a starting list every day, designating who was to do ramp work and who was to do street work. Abernathy denied that he had anything to do with these assignments and specifically denied that he assigned the plaintiff to the work he was doing when he was injured.

The witness stated that in his capacity as supervisor for Conrail's piggyback operation it was his responsibility to see that the trains were

loaded and left the yard on schedule. This responsibility included seeing that the PTL ramp workers did their work within a reasonable length of time. Abernathy observed that he sometimes requested that the men speed up their work and that they almost always complied with his requests. Abernathy was on the ramp only "once in awhile," but Conrail did have a full-time programmer. Abernathy further testified that he had given orders to ramp workers and PTL dispatchers but not to the PTL manager.

Abernathy also testified that on one occasion he left the terminal and went to the scene of an accident when a trailer capsized while being hauled by a PTL employee. Abernathy stated that he returned to the terminal and instructed a PTL driver to haul an empty trailer to the scene of the accident. Once the capsized trailer was upright, Abernathy instructed another PTL driver to haul it away from the scene. This was the only occasion Abernathy could recall in which he gave instructions to PTL employees doing street work. It is noteworthy that there is no evidence that it was necessary, or that Abernathy deemed it necessary, for the consent or approval of PTL to be sought before taking charge at the scene of the wrecked trailer.

The plaintiff next called Jack Hopkins, who testified that he had been employed by PTL for 18 years. He stated that he had done both ramp and street work. He noted that the number of men assigned to work a certain shift was determined by the railroad schedule on a day-to-day basis and that the workers were selected according to seniority. Hopkins related that the railroad would tell the PTL dispatcher if extra men were needed on a shift or if some of the men were to report to work earlier than usual.

Hopkins stated that he saw Terry Abernathy in the yards once in awhile and that Abernathy would occasionally ask the men to speed up the work and they usually complied. Conrail employees also informed ramp workers about changes in the trailers to be loaded, and Hopkins was sometimes told by railroad personnel that certain trucks had priority over others for loading purposes.

The testimony of two other long-time PTL employees closely followed that of Jack Hopkins. Additionally, they noted that PTL employees would break and replace the seals of trailers at the request of and in the presence of Conrail employees. Furthermore, occasionally when doing street work, the PTL employees would be given a delivery dispatch by the railroad clerks in the railroad office.

The plaintiff, Eugene Kottmeyer, testified that in August of 1976, his regular job assignment was yard work, a position for which he had "bid" for a period of 30 days. On the Friday before his injury, the plaintiff "signed up" for yard work on Saturday and street work on Sunday.

According to plaintiff, on Sunday, the day of his injury, he reported

for work at the Roselake yard at 10 a.m. Plaintiff related that at 3 or 3:30 in the afternoon he drove his tractor back to the Roselake yard after delivering a trailer and that he pulled in on the right side of the road next to a line of timbers in front of two or three other tractors. Plaintiff stated that after parking, he got out and walked around the front of the tractor on his way to the PTL truck garage and that when he reached the passenger side of his tractor, he stepped up onto one of the timbers with his left foot. He testified that he made a pivot to his right, came across with his right foot, and then tripped and fell forward on his right knee and both hands. He related that after he got up he saw a rod sticking up about 2½ inches above the timber. Plaintiff recalled that there were nails driven into the timber but that they were not securing the rod.

Plaintiff further testified that after his fall, he obtained another dispatch and left to deliver another trailer. He said that his leg hurt at this time but that he did not worry because he had fallen before. Plaintiff stated that the pain continued, however, and that after delivering the second trailer, he punched the time clock and went home.

Plaintiff stated that on the following day he reported to the yard but was unable to work because of the condition of his leg. The same morning Dr. Goldenberg, the company doctor, X rayed the leg, treated it with ultrasound and had it wrapped. He advised the plaintiff not to work and to obtain pain medication.

After about one month, plaintiff was referred to Dr. Kuhlman at Barnes Hospital in St. Louis. An arthrogram was performed, which revealed a loose body in the knee and torn cartilage. Surgery was performed in October, and plaintiff remained in the hospital until November 24, 1976. The plaintiff testified that after his release from the hospital, he was able to walk on crutches and that he exercised his leg according to the doctor's instructions. However, the knee remained swollen for several months. Finally, on April 1, 1977, plaintiff was released to return to work.

Plaintiff related that after his return to work, he began experiencing increasing difficulty with the leg; Dr. Kuhlman prescribed braces for the leg when advised of the difficulty. The plaintiff also stated that in June 1977, he was walking on a catwalk at work when his right leg gave way. He was taken to the hospital, where fluid was removed from the knee and the knee was wrapped.

In October 1977, plaintiff saw Dr. Bolton, who was recommended to him by fellow employees. Subsequently, plaintiff missed work for the first three months of 1978, because of stiffness in the leg caused by bad weather. He testified that at the time of trial he was still experiencing pain and numbness in the area of his right knee. He stated that he had difficulty walking more than short distances and that he was unable to climb or crawl. Plaintiff also testified that he had pain in his left hip, which he

attributed to the fact that he carried all his weight on his left side. He noted that he missed five or six days of work per month because of his leg.

Dr. Robert E. Kuhlman testified that he was unable to establish the origin of the loose bodies in plaintiff's knee but "felt that it was possible that they may have originated at the time of injury" on August 29, 1976. During the surgery he performed on the knee, Dr. Kuhlman removed torn cartilage and a hard, calcified mass of tissue at the posterior portion of the knee. He stated that in his opinion, the mass of tissue had been present in the knee prior to the accident. He felt that the effect of plaintiff's fall was "the disruption or tearing of this knee cartilage." He noted that following surgery, the plaintiff's right knee could reasonably be expected to develop arthritic changes more rapidly than the left knee. Dr. Kuhlman observed that while plaintiff would continue to have some residual disability, he believed that plaintiff would be able to function.

Dr. Robert L. Bolton testified that he first saw the plaintiff on October 3, 1977, and last saw him on June 18, 1978. Dr. Bolton testified that in his opinion, the plaintiff would have pain in his right knee for a long time and possibly for the rest of his life. He noted that the arthritic changes in the knee would become progressively worse. Dr. Bolton testified that he also observed arthritic changes in the plaintiff's lumbar spine, some of which were attributable to conditions prior to the injury to plaintiff's knee. In Dr. Bolton's opinion, however, the arthritic changes were accelerated by the plaintiff's limp, which caused him to put stress on different parts of the lower extremities. Dr. Bolton further testified that the plaintiff would need further medical treatment, that his right knee could give way, and that the plaintiff would find the performance of his job activities difficult and perhaps dangerous.

Following testimony and arguments, the jury found for the plaintiff and concluded that, at the time of his injury, plaintiff had been employed by Conrail for purposes of the FELA.

On appeal, Conrail first argues that the evidence did not support a finding that plaintiff was employed by defendant and that, therefore, their motion for a directed verdict should have been granted. In conjunction with the employment issue, Conrail asserts that evidence regarding yard or ramp work should not have been admitted since plaintiff was performing street work at the time he was injured.

The Federal Employers' Liability Act makes a covered railroad liable for negligently causing injury or death to any person "while he is employed" by the railroad. (45 U.S.C. §51 (1976).) The question of employment under the FELA was addressed by the Supreme Court in *Kelley v. Southern Pacific Co.* (1974), 419 U.S. 318, 42 L. Ed. 2d 498, 95 S. Ct. 472. In *Kelley*, plaintiff was employed by a trucking company which was a wholly owned subsidiary of the railroad. The trucking company worked

primarily in conjunction with the railroad operations of its parent company. Plaintiff was injured while unhooking automobiles from their places on railroad cars in order to drive them into the defendant's railyard for transfer to the trucking company's auto trailers. Although there were railroad employees in the area who would occasionally consult with trucking company employees about the unloading process, trucking supervisors controlled and directed the day-to-day operations.

Although the plaintiff in *Kelley* acknowledged he was technically in the employ of the trucking company rather than the railroad, he contended that his work was sufficiently under the control of the railroad to bring him within the coverage of the FELA. The United States District Court found that the trucking company was serving generally as the railroad's agent, that trucking company employees were agents of the railroad for purposes of the unloading operation, and that because the work being performed by the plaintiff was in fulfillment of a duty of the railroad, the relationship between plaintiff and the railroad was sufficient to bring him within the FELA. The Court of Appeals reversed, observing that the District Court had not found that plaintiff was "employed" by the railroad and holding that the "while employed" clause of the FELA requires a finding not just of agency but of a master-servant relationship between the railroad and the plaintiff.

On appeal, the Supreme Court concluded that "[f]rom the beginning the standard has been proof of a master-servant relationship between the plaintiff and the defendant railroad." (419 U.S. 318, 323, 42 L. Ed. 2d 498, 505, 95 S. Ct. 472, 476.) The court then stated that in determining whether such a relationship exists, common-law principles are to be applied. It observed that section 220(1) of the Restatement (Second) of Agency (1958) defines a servant as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." According to the court, the railroad's "control or right to control" the performance of the services provided by the plaintiff accordingly becomes the key issue.

The court in *Kelley* notes that under common-law principles, there are basically three methods by which a plaintiff can establish "employment" with a rail carrier, even while nominally employed by another. The employee could: (1) be the borrowed servant of the railroad; or (2) be acting for two masters simultaneously; or (3) be a subservant of a company that was in turn a servant of the railroad. (*Kelley*, 419 U.S. 318, 323, 42 L. Ed. 2d 498, 505, 95 S. Ct. 472, 476.) However, the employee must be a servant and not merely an agent of the railroad. As stated by the Supreme Court, the "finding that the railroad was 'responsible' for the unloading operations is significantly weaker than would be a finding that

it controlled or had the right to control the physical conduct" of the trucking company employees (419 U.S. 318, 323, 42 L. Ed. 2d 498, 505, 95 S. Ct. 472, 478.) The court then remanded the case to the United States District Court for consideration of the facts in accordance with its opinion.

Cases following *Kelley* have recognized the importance of control in determining "employment":

> " 'Supervision' is a criterion that in importance far exceeds the others. As used in this context, supervision means control of the individual workman's physical conduct [citation], not just oversight; 'control [of] the individual in the *performance* of his work and [of] the *manner* in which the work is done . . . is *usually decisive.*' [Citation.] employers are distinguished from independent contractors most basically by the detail with which the party for whom the work is eventually produced actually supervises the manner and means by which the work is performed; and *degree of control* or *supervision* is the principal element that differentiates employees and independent contractors at common law, in the state statutory context, and in the context of other federal statutes as well." *Lodge 1858, American Federation of Government Employees v. Webb* (D. C. Cir. 1978), 580 F.2d 496, 504-05.

Proof of employment is not strictly limited to evidence of actual control or supervision by the railroad over the physical conduct of the plaintiff, however. Proof that the railroad had the right to control the employee's activities serves as well. (*Pelliccioni v. Schuyler Packing Co.* (1976), 140 N.J. Super. 190, 356 A.2d 4.) Such evidence both meets the Restatement definition of "servant" (Restatement (Second) of Agency §220(1), at 485 (1958)) and tends to establish the third method outlined by the court in *Kelley* by which plaintiff who is nominally employed by another can prove employment (*i.e.*, subservant of a company in turn a servant of the railroad). In determining whether the railroad had the right to control the employee's activities, all of the surrounding circumstances must be considered. (*Pelliccioni.*) In fact, the Restatement outlines a number of nonexclusive factors to be considered in determining the existence of a master-servant relationship. Restatement (Second) of Agency §220(2), at 485-86 (1958).

In the instant case, we believe the evidence was sufficient to present a jury question as to whether the plaintiff was an employee of Conrail for purposes of the Federal Employers' Liability Act. Much of the evidence tended to show that plaintiff was the servant of a company (PTL), which was in turn a servant of Conrail. However, the case need not depend on this relationship alone. The evidence of direct control by Terry Abernathy and other Conrail employees over plaintiff and various other PTL

employees was sufficient to establish a question as to plaintiff's employment status which should have been presented to the jury.

The evidence established that PTL is a subsidiary of Conrail; that Conrail owns the premises where ramp operations are conducted and provides the portable ramps; that Conrail's terminal manager, Terry Abernathy, was responsible for ensuring that PTL employees loaded the trains within a reasonable length of time; that Abernathy sometimes directed PTL employees to speed up their work; that Conrail supervisors instruct PTL employees regarding changes in trailer loading; and that PTL employees often repair railroad equipment with the knowledge of Conrail supervisors. The evidence also disclosed that PTL employees were sometimes instructed by Conrail supervisors to break the seals on trailers to check the contents; that PTL work schedules are determined by the rail schedule; and that on at least one occasion Conrail, without the necessity of obtaining specific authority so to do, exercised control over the conduct of PTL employees engaged in street work off the premises as well.

■■ All of these instances of direct control or supervision over the day-to-day performance of duties of PTL employees are sufficient to establish employment for purposes of the Federal Employers' Liability Act under the principles of *Kelley*. Defendant urges, however, that the evidence regarding control over ramp or yard work was not relevant because the issue in dispute was the plaintiff's employment status at the time of his injury and plaintiff was engaged in street work at that time.

Defendant's arguments are not persuasive. The question of employment is for the jury on the basis of all relevant information. (*Ward v. Atlantic Coast Line R.R. Co.* (1960), 362 U.S. 396, 4 L. Ed. 2d 820, 80 S. Ct. 789.) The inquiry extends not only to control the employee's actions but to the right to control those actions as well. (Restatement (Second) of Agency §220(1), at 485 (1958).) In considering the right to control, which establishes a master-servant relationship, all of the surrounding circumstances must be considered. (*Pelliccioni*.) In the case at bar, the supervision and direction which Conrail exercised over the activities of the PTL employees at the loading yard was relevant in this regard. Moreover, the evidence established control by Conrail over the activities of PTL employees performing street work as well; therefore, the distinction between yard and street work is not significant in this context. Consequently, we conclude that the evidence was sufficient to present the question of employment to the jury, and the court properly denied defendant's motion for directed verdict.

■■ Defendant also argues that the trial court erred in sustaining the plaintiff's objection to admission of the trucking and terminal service

agreements between Conrail and PTL. Those agreements provided in pertinent part as follows:

> "[Pennsylvania Truck Lines agents, servants or employees] shall be the sole agents, servants or employees of and subject to the sole control and direction of Contractor (PTL), *and shall not be agents, servants or employees of Conrail.* Contractor shall remain as INDEPENDENT CONTRACTOR with respect to all services performed under this Agreement. Neither under this Agreement, nor by such subsequent understanding, arrangement, or practice, oral or written, shall Conrail have any authority to alter, supervise and direct the manner in which Contractor shall perform the service to be rendered hereunder, and it is expressly understood and acknowledged that Conrail shall not have the authority to alter by agreement, subsequent understanding, arrangement, or practice, oral or written, Contractor's status as an independent contractor."

When the agreements were offered into evidence, counsel for plaintiff objected, and the objection was sustained.

Defendant points out that under section 220(2) of the Restatement of Agency, a factor to be considered in determining whether one acting for another is a servant is "whether or not the parties believe they are creating the relation of master and servant." (Restatement (Second) of Agency §220(2)(i) (1958).) Defendant asserts that the trucking and terminal service agreements are probative of the belief of the parties.

Comment to section 220 of the Restatement notes that "[i]t is not determinative that the parties believe or disbelieve that the relation of master and servant exists, except insofar as such belief indicates an assumption of control by the one and submission to control by the other." (Restatement (Second) of Agency §220, comment *m*, at 492 (1958).) If proof of the master-servant relationship between Conrail and the plaintiff depended upon proof that plaintiff was a subservant of a company in turn a servant of Conrail, the agreements between Conrail and PTL, its subsidiary, would have been relevant. The belief of Conrail and PTL, as expressed in the agreements, tends to disprove assumption of control by Conrail and submission to control by PTL. However, the evidence of actual control by Conrail supervisors over the day-to-day activities of the plaintiff and other PTL employees establishes employment without reliance upon the master-servant-subservant relationship between parent company, subsidiary, and employee that was described in *Kelley*. The evidence showed that Conrail gave directions and that plaintiff and other PTL employees almost always acceded. Because of the assumption of control by Conrail and the submission to control by the PTL employees,

as demonstrated by their actions, the contractually expressed belief of Conrail and PTL, a third party not named in this action, is neither relevant to nor probative of the question of employment. Plaintiff and the other PTL employees were not parties to the agreements; and the agreements in no way reflect upon the ongoing day-to-day relationship between Conrail and the PTL employees as indicated by their actions.

Moreover, the FELA provides that contractual provisions which are intended to avoid liability under the FELA are void. The Act states in part as follows:

> "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void * * *." (45 U.S.C. §55 (1976).)

We need not determine whether the relevant provisions of the trucking and terminal service agreements were specifically and consciously included for the purpose of avoiding liability under the FELA. There is evidence that the provisions of the agreements were directly refuted by the actual day-to-day operation of defendant's unloading procedures, which are controlling with respect to the employment status of plaintiff. Accordingly, we conclude that the agreements were properly excluded from evidence.

Defendant next argues that the trial court erred in refusing to give a special interrogatory submitted by defendant regarding contributory negligence. The proposed interrogatory stated:

> "Do you find from the evidence that at and immediately prior to the occurrence in issue the plaintiff was guilty of any contributory negligence which was the proximate cause of said occurrence?"

In its brief on appeal, defendant notes that the interrogatory was directed toward count II of plaintiff's complaint, which was based on common-law negligence.

■■ Special interrogatories are used for the purpose of testing a general verdict against a jury's conclusion as to the ultimate controlling facts. (*Freehill v. De Witt County Service Co.* (1970), 125 Ill. App. 2d 306, 261 N.E.2d 52.) Section 65 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 65), governing the use of such interrogatories, provides:

> "Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact stated to them in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law."

The courts have held, however, that the use of a special interrogatory is limited in its purpose, and thus it is not always proper. In *Gasbarra v. St. James Hospital* (1979), 85 Ill. App. 3d 32, 406 N.E.2d 544, this issue was considered. The court there stated:

"For a special interrogatory to be proper, an answer responsive thereto must be inconsistent with some general verdict that might be returned. [Citation.] Its function is to require the jury's determination as to one or more specific issues of ultimate fact and operates as a check upon the deliberations of the jury [citation], and a special interrogatory asking for a finding as to a mere evidentiary fact is always improper [citation]. In the instant case, it is our belief that the special interrogatory was not inconsistent with some general verdict that might be returned and should not have been given. Whether the interrogatory was answered affirmatively or negatively, it would not have been inconsistent with any general verdict here, * * *." *Gasbarra v. St. James Hospital*, 85 Ill. App. 3d 32, 38, 406 N.E.2d 544, 550.

■■ In the case at bar, either an affirmative or negative answer to the special interrogatory proposed by defendant would not necessarily be inconsistent with any general verdict the jury could have returned. A verdict for plaintiff may have been based on the Federal Employers' Liability Act, section 53 of which provides as follows:

"In all actions * * * the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee * * *." (45 U.S.C.A. §53 (1976).)

Since the jury in the case at bar may have concluded that plaintiff was contributorily negligent and still found for either the defendant or the plaintiff, the required inconsistency between the proposed special interrogatory and general verdict is not present. Moreover, it is of no consequence that defendant sought to direct the interrogatory only to the common-law negligence count of plaintiff's complaint. It is proper to refuse a special interrogatory where it would not control the general verdict for the reason that it did not reach all of the good counts of the complaint which were supported by evidence. *Davidson v. Montgomery Ward & Co.* (1912), 171 Ill. App. 355.

Defendant next contends that the trial court erred in admitting into evidence two letters sent to PTL employees by Conrail. The letters indicated that PTL employees were "protected employees" under title V of the Regional Rail Reorganization Act. (45 U.S.C. §701 *et seq.* (1976).) The letters explained the protected status of the employees and offered employment with Pennsylvania Truck Lines, Inc., as a subsidiary of

Conrail. Defendant argues that the letters were not relevant to the issue of employment since the Regional Rail Reorganization Act does not indicate that a "protected employee" under its terms is the same as an "employee" under the Federal Employers' Liability Act.

In its definitional section, the Regional Rail Reorganization Act provides:

"(2) 'employee of a railroad in reorganization' means a person who, on the effective date of a conveyance of rail properties of a railroad in reorganization * * * has an employment relationship with either said railroad in reorganization or any carrier (as defined in parts I and II of the Interstate Commerce Act) which is leased, controlled, or operated by the railroad in reorganization * * *." 45 U.S.C. §771(2) (1976).

We agree with defendant that the term "protected employee" under the Regional Rail Reorganization Act is not relevant with regard to the determination of whether plaintiff was an "employee" under the Federal Employers' Liability Act. Under the Regional Rail Reorganization Act, an individual could be an employee of a carrier leased, controlled, or operated by a railroad and thus be a protected employee without being subject to control of his day-to-day employment activities, which is required for employment status under the FELA. (See, *e.g., Kelley v. Southern Pacific Co.*) However, while the standards for determining employment status differ, the evidence that Conrail exercised direct control and supervision over various daily activities of PTL employees was not controverted by defendant. Accordingly, we believe that admission of the letters from Conrail to the plaintiff constituted harmless error.

■■ ■ Defendant's final contention is that the verdict, which awarded damages in the amount of $175,000, was excessive. Specifically, defendant argues that the fact that plaintiff incurred medical bills of only $3,776.77 and lost no more than $36,000 in wages is indicative of the excessive nature of the damages awarded. Defendant additionally contends that the award obviously was not diminished by the jury to take into account the contributory negligence of the plaintiff, as required by the comparative negligence doctrine of the FELA (45 U.S.C. §53 (1976)).

A court of review may scrutinize the record to determine whether the amount of the verdict is so large as to indicate passion and prejudice or as to shock the judicial conscience. (*Wood v. Mobil Chemical Co.* (1977), 50 Ill. App. 3d 465, 365 N.E.2d 1087.) The reviewing court may order remittitur or a new trial in appropriate cases, but in personal injury cases it is impossible to establish a precise formula to determine when an award is excessive. (*Ball v. Continental Southern Lines, Inc.* (1977), 45 Ill. App. 3d 827, 360 N.E.2d 81.) The determination of an adequate verdict is peculiarly within the province of the jury. Great weight must be given to

the jury's determination, and its result will not be disturbed unless all reasonable men would agree that the amount is excessive. (*Horton v. City of Ottawa* (1976), 40 Ill. App. 3d 544, 352 N.E.2d 23.) In addition, since the issue is one of fact, the court may not substitute its inferences and conclusions of fact for those drawn by the jury if those drawn by the jury are reasonably supported by the evidence. *Horton*.

Where a damage award includes recovery for pain and suffering or some type of permanent or progressive disability, the precise dollar value of compensation is particularly difficult to determine. These matters are not necessarily related to the amount of medical expenses incurred or the period of employment lost. *Horton*.

■■ In the instant case, testimony indicated plaintiff might have pain in his right knee for the rest of his life. All physicians who testified agreed that arthritic changes in the knee would become progressively worse. Plaintiff walked with a limp, had lost a number of months of employment, and continued to miss five or six days of work per month because of his injury. A pre-existing lumbar condition was aggravated by the limp, and testimony indicated that the plaintiff would require further medical treatment. The jury would have been justified in finding that all of these conditions resulted from the negligence of defendant. Furthermore, there is no evidence that the jury did not diminish its award to compensate for the degree of contributory negligence it found plaintiff to be guilty of. Therefore, under the constraints placed upon us as a court of review, we conclude that the amount of damages awarded by the jury should not be disturbed.

For the foregoing reasons, we affirm the judgment of the circuit court of St. Clair County.

Affirmed.

JONES and HARRISON, JJ., concur.