MICHAEL BUCCIERI, Plaintiff-Appellant, v. ILLINOIS CENTRAL GULF RAILROAD, Defendant-Appellee.

First District (1st Division)   No. 1—90—2597

Opinion filed August 31, 1992.—Rehearing denied October 21, 1992.

Terrence K. Hegarty & Associates, Ltd., of Chicago (Terrence K. Hegarty and James S. Smith, of counsel), for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Tobin, Gary W. Fresen, Michael A. Pollard, Barrie L. Brejcha, and Charles W. Webster, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff Michael Buccieri filed this personal injury action against Illinois Central Gulf Railroad (IC) pursuant to the Federal Employers' Liability Act (FELA) (45 U.S.C. §§51 through 60 (1988)). Plaintiff alleged that he was a railroad "employee" of IC at the time of his in-

jury and, accordingly, came within the protections of FELA. Plaintiff and IC filed cross-motions for summary judgment on the issue of plaintiff's "employee" status, and the circuit court of Cook County granted IC's motion. Plaintiff brings this appeal asserting that summary judgment was erroneously granted as a genuine issue of material fact exists as to whether plaintiff was an IC employee at the time of his injury for FELA purposes. We reverse and remand.

IC operates an Intermodal Exchange (IMX) yard at 3000 South Damen Avenue in Chicago. The word "intermodal" refers to a change from one "mode" of transportation to another; in this case, a change from motor carrier transit to rail transportation. At the IMX yard, "piggyback" trailers are loaded and unloaded from flatbed railroad cars.

From January 1, 1977, through May 1986, TLI, Inc. (TLI), contracted with IC to perform the loading and unloading operations at the IMX yard. TLI is a labor-leasing firm that employs approximately 200 Teamster Union laborers in the Chicago area. Under the TLI-IC contract, TLI was required to provide IC with trained and qualified manpower to perform the loading, unloading and delivery operations relating to the piggyback trailers. In exchange for this manpower, IC paid TLI a management fee plus an amount equal to what TLI compensated its employees in wages and benefits.

Pursuant to the IC-TLI agreement, the parties agreed that all TLI employees remained exclusively TLI employees. Some of the other, more relevant contract provisions include: (1) IC's right to have TLI remove any employee from IC property for any reason within 30 days of that employee's employment and, thereafter, for just cause only; (2) TLI's responsibility for holding safety and operational meetings and disciplining its employees; (3) IC's responsibility to report all accidents to TLI for disciplinary purposes; and (4) the respective responsibility of TLI and IC regarding injuries to TLI employees and third persons.

During the performance of the contract, as related in the deposition testimony of various IC and TLI employees, the number of TLI employees assigned to work at the IMX yard varied either daily or weekly depending on the volume of IC's business. IC was responsible for advising TLI of its expected rail volume; TLI, in turn, supplied the correct number of workers. In 1985, the year of plaintiff's injury, there were between 15 and 17 yard workers at the IMX yard.

TLI supplied yard workers for three different job positions at the IMX yard. First, a "tie down man" worked directly on railroad flat cars where he opened and closed hitches holding the piggyback trail-

ers to the flatcar. IC supplied the tie down man's principal tool: a tie down bar. Second, a "gantry operator" used an overhead crane or gantry to lift the piggyback trailers onto and off the railroad flatcars. Third, a "spotter" transported the piggyback trailers from the railroad flatcars to various areas in the IMX yard. The spotter used a "spotting horse," which is a truck that lifts the front end of the trailer off the ground. IC supplied to TLI employees all gantry and spotter trucks.

The personnel who supervised daily activities at the IMX yard were IC's direct employees and, in descending hierarchy, were the terminal manager, the dispatcher and yard supervisor. The yard supervisor was in charge of the yard and had ultimate responsibility for numerous activities, including: the loading and unloading of trains; the inspection of incoming and outgoing trains; the assurance that the correct trailers were on the train; the inspection of the work performed by the spotter, gantry operator and tie down man; and to assure that corrections were made of mistakes which TLI employees made such as the loading of incorrect cargo.

TLI did not have supervisors present at the IMX yard on a daily basis. A TLI supervisor would only visit the yard twice a week for the purposes of picking up and delivering payroll to TLI employees. The checks TLI employees cashed were imprinted with the TLI logo. No TLI supervisor would communicate work assignments to TLI employees or inspect its employees' daily work. TLI relied on IC to report any accident or safety violations regarding TLI employees.

On an average work day, TLI's yard workers reported to the IMX yard and not to TLI's nearest corporate office in Hillside, Illinois. Upon their arrival, yard workers punched a time clock located outside IC's dispatcher's office. The railroad's dispatcher would hand the time cards to the yard workers as they arrived and would receive them after they were punched. The yard workers then proceeded to the railroad's locker room, where they would change into their work clothes. The workers would wait in the locker until the yard supervisor arrived. The yard supervisor then delivered to the spotter a "track sheet," which contained information regarding the railroad car numbers, the trailers that were to be loaded, the direction of the car, and the railroad track where the railroad car was located. Having their assignments, the yard workers would then proceed to the yard where they would undertake the loading or unloading process.

As the volume of rail work varied with each day, a three-member TLI crew was subjected to various amounts of daily work. If rail volume was high and a time deadline for a train departure existed, a TLI

crew could work overtime. The length of lunches and breaks, which were normally 1 hour and 10 to 15 minutes, respectively, were subject to the demands of a given day's rail volume.

Plaintiff started working at IC's railroad yard in 1970 and continued working there until his injury on March 13, 1985. When plaintiff commenced employment, he worked for Universal Leaseway Systems of Illinois. In 1975, IC terminated Universal Leaseway and entered the aforementioned contract with TLI. Despite the change in companies, plaintiff's job duties, benefits, compensation, seniority, etc., did not change in any way.

On the day of plaintiff's injury, plaintiff and two other TLI crewmen, Joe Beringer and Robert Stokes, were working the midnight to 9 a.m. shift. Plaintiff was working as the gantry operator, with Stokes as the tie down man and Beringer the spotter. IC's yard supervisor was Richard Fiala and, because it was the midnight shift, Fiala was the only IC supervisor present.

At 3 a.m., the men took their break. Fiala gave plaintiff and Stokes a ride in his truck from their jobsite to the yard drivers' room, approximately one mile away. After approximately 30 minutes, Beringer, Stokes and plaintiff returned outside to look for Fiala to obtain a ride to the jobsite. When Fiala did not appear, plaintiff and Stokes flagged down Beringer, who was driving an IC spotter truck, and requested that Fiala be radioed for a return ride. When Fiala did not respond, plaintiff and Stokes accepted Beringer's request that they ride to the jobsite on the back of his spotter truck. Stokes hung onto a ladder near the driver's side door and plaintiff climbed up and stood on the steel grate facing forward behind the tractor. Plaintiff had one foot on the catwalk, the other on the spotter gasoline tank, and held with both hands onto a vertical bar beside the back window.

Beringer started driving toward the railroad tracks, and the spotter truck reached a speed of about 10 miles per hour after 100 feet. After travelling about 100 to 150 feet, the truck accelerated and the transmission jerked. Stokes grabbed the ladder more tightly, but plaintiff fell off the back of the truck, landed on his head, and suffered significant injuries. Plaintiff is unable to return to work.

Following his injury, plaintiff filed suit against IC pursuant to FELA alleging that he was an IC employee for FELA purposes at the time of his injury and that his injuries resulted, in whole or in part, from the negligence of IC's officers, agents or employees. Following the filing of cross-motions for summary judgment on the employee issue, the circuit court entered an order granting IC's motion for summary judgment. This appeal followed.

The sole issue on appeal is whether summary judgment was properly granted to IC on the ground that plaintiff was not an "employee" of IC for FELA purposes at the time of his injury.

Summary judgment shall be entered when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c).) While the use of the summary judgment procedure is to be encouraged as an aid in the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871.) In determining the existence of a genuine issue of material fact, courts must consider the pleadings, depositions, admissions, exhibits, and affidavits on file in the case and must construe them strictly against the movant and liberally in favor of the opponent. (*Purtill*, 111 Ill. 2d at 240, 489 N.E.2d at 871.) Reviewing courts apply a *de novo* standard of review when determining the propriety of summary judgment. *Shull v. Harristown Township* (1992), 223 Ill. App. 3d 819, 585 N.E.2d 1164; *Briggs Manufacturing Co. v. Industrial Comm'n* (1989), 212 Ill. App. 3d 318, 570 N.E.2d 1152; *Demos v. National Bank* (1991), 209 Ill. App. 3d 655, 567 N.E.2d 1083; *General Motors Corp. v. Douglass* (1990), 206 Ill. App. 3d 881, 565 N.E.2d 93.

■ The dispute in this case requires this court to construe section 51 of FELA, which provides in relevant part:

"Every common carrier by railroad while engaged in commerce *** shall be liable in damages to any person *suffering injury while he is employed by such carrier in such commerce* *** for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." (Emphasis added.) 45 U.S.C. §51 (1988).

In *Kelley v. Southern Pacific Co.* (1974), 419 U.S. 318, 42 L. Ed. 2d 498, 95 S. Ct. 472, the Court applied and interpreted section 51 under somewhat similar circumstances to the case at bar. As *Kelley*'s facts and discussion of law bear heavily on this case, we discuss it at length.

In *Kelley*, petitioner Eugene Kelley was seriously injured when he fell from the top of a tri-level railroad car where he had been work-

ing. Although Kelley acknowledged that he was technically an employee of a trucking company rather than of Southern Pacific Company, the respondent railroad, Kelley sought recovery under FELA on the theory that the railroad sufficiently controlled his work thereby making him a railroad employee for FELA purposes. *Kelley*, 419 U.S. at 319-20, 42 L. Ed. 2d at 503, 95 S. Ct. at 474.

The evidence in *Kelley* showed that, at the time of his accident, Kelley had worked for Pacific Motor Trucking Company (PMT) for about eight years. PMT was engaged in various trucking enterprises in conjunction with the railroad operations of its parent company, Southern Pacific Company. As part of its contractual obligations with the railroad, PMT would unload new automobiles from Southern Pacific's tri-level auto-carrying flatcars when they arrived in the yard. Kelley's job was to unhook automobiles from the railroad cars and drive them into the yard for further transfer to PMT auto trailers and ultimate delivery to car dealers. Although there were Southern Pacific employees in the area who would occasionally consult with PMT employees about the unloading process, PMT supervisors controlled and directed the day-to-day operations. Kelley was injured when he fell while unhooking automobiles from the top level of a tri-level flatcar. Kelley filed suit under FELA, and the district court ruled in Kelley's favor on the employee issue. The ninth circuit reversed, and the Supreme Court granted *certiorari*. *Kelley*, 419 U.S. at 320-22, 42 L. Ed. 2d at 503-05, 95 S. Ct. at 474-75.

In its analysis, the Court emphasized that proving the "while employed" clause of FELA required proof of a master-servant relationship. The Court reviewed a few of its earlier FELA cases and noted that the words "employee" and "employed" in the statute were used in their conventional sense, with the master-servant relationship determined by reference to common-law principles. *Kelley*, 419 U.S. at 323-24, 42 L. Ed. 2d at 505, 95 S. Ct. at 476.

The Court endorsed the approach of its prior decisions which had relied on sections of the Restatement (Second) of Agency dealing with the borrowed-servant doctrine and master-servant relationship as guidelines for analyzing the employee issue and formulating proper jury instructions thereon. (*Kelley*, 419 U.S. at 323-24, 42 L. Ed. 2d at 505-06, 95 S. Ct. at 476.) The Court referred specifically to sections 220(1) and (2) of the Restatement, with the former defining servant as " 'a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control' " (*Kelley*, 419 U.S. at 323-24, 42 L. Ed. 2d at 506, 95 S. Ct. at 476, quoting

Restatement (Second) of Agency §220(1) (1958)), and the latter listing 10 factors which are to be considered in determining whether servant status exists. While the Court recognized that section 220 is directed primarily towards determining whether a particular bilateral arrangement could properly be characterized as a master-servant or independent contractor relationship, the section was "instructive in analyzing the three-party relationship between two employers and a worker." *Kelley*, 419 U.S. at 324, 42 L. Ed. 2d at 506, 65 S. Ct. at 476.

■ The Court in *Kelley* further stated that, under common-law principles, three basic methods exist by which a plaintiff can establish his "employee" status with a rail carrier for FELA purposes even while nominally employed by another. First, the employee could be serving as a borrowed servant of the railroad at the time of his injury. (See Restatement (Second) of Agency §227 (1958).) Second, he could be deemed to be acting for two masters simultaneously. (See Restatement (Second) of Agency §226 (1958).) Third, he could be a subservant of a company that was in turn a servant of the railroad. See Restatement (Second) of Agency §5(2) (1958); *Kelley*, 419 U.S. at 324, 42 L. Ed. 2d at 506, 65 S. Ct. at 476.

Applying the law to the facts before it, the Court believed that nothing in the district court's findings suggested that Kelley was sufficiently under the respondent railroad's control to render him a borrowed or dual servant. Even under the subservant theory, the district court's findings did not establish the master-servant relationship between PMT and the railroad necessary to render Kelley a subservant of the railroad. (*Kelley*, 419 U.S. at 325, 42 L. Ed. 2d at 506, 65 S. Ct. at 476-77.) This relationship exists only where the railroad controls or has the right to control the physical conduct of the second company, and it is distinguishable from an agency relationship, upon which the district court's analysis incorrectly focused, as an agency relationship is broader than the master-servant relationship required under FELA. *Kelley*, 419 U.S. at 325-26, 42 L. Ed. 2d at 506-07, 65 S. Ct. at 476-77.

The Court next rejected the dissenter's argument that, even though the district court had applied the wrong legal standard, affirmance should occur because the evidence otherwise established a master-servant relationship. For example, the Court was not persuaded by the evidence that Kelley and his crew worked most of the time on the railroad's premises and that railroad employees were responsible for checking safety conditions on the tri-level cars. These facts reflected nothing more than the railroad and PMT being engaged in closely related activities which needed to be coordinated.

Naturally, observed the Court, PMT and railroad employees had substantial contact with one another. *Kelley*, 419 U.S. at 326-27, 42 L. Ed. 2d at 507, 95 S. Ct. at 477.

Also, while the railroad's supervisory personnel were occasionally in the unloading area and occasionally advised or consulted with PMT employees and supervisors, no finding was made that "Southern Pacific employees played a *significant supervisory role* in the unloading operation or, more particularly, that petitioner was being supervised by Southern Pacific employees at the time of his injury. Nor did the [district] court find that Southern Pacific employees had any general right to control the activities of petitioner and the other PMT workers." (Emphasis added.) (*Kelley*, 419 U.S. at 327, 42 L. Ed. 2d at 507-08, 95 S. Ct. at 477-78.) Finally, although Kelley directed the Court to other contacts between himself and various railroad employees, the Court believed that these contacts were simply not supervisory in nature. (*Kelley*, 419 U.S. at 327 nn.8 & 9, 42 L. Ed. 2d at 507-08 nn.8 & 9, 65 S. Ct. at 477-78 nn.8 & 9.) The Court later emphasized:

> "In this case, as in *Anderson*, the evidence of contacts between Southern Pacific employees and PMT employees may indicate, not direction or control, but rather the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation. [Citation.] The informal contacts between the two groups *must assume a supervisory character before the PMT employees can be deemed pro hac vice employees of the railroad.*" (Emphasis added.) *Kelley*, 419 U.S. at 330, 42 L. Ed. 2d at 509, 65 S. Ct. at 479.

■ We believe *Kelley*'s intimate discussion of the facts and law bears significantly on the merits of this case. With respect to the law, *Kelley* requires this court to apply traditional common-law principles in determining whether plaintiff in this case constituted an IC employee for FELA purposes at the time of his injury. Section 220 of the Restatement (Second) of Agency, which outlines a number of nonexclusive factors, is particularly instructive. Also, for FELA purposes, there are three methods by which a plaintiff can establish his employee status with a railroad although nominally employed by another: the borrowed, dual and subservant scenarios.

Turning to the facts of *Kelley* as applied to the instant case, we believe *Kelley* is distinguishable. In *Kelley*, "[a]lthough there were Southern Pacific employees in the area who would occasionally consult with PMT employees about the unloading process, *PMT supervisors controlled and directed the day-to-day operations [in the yard].*" (Emphasis added.) (*Kelley*, 419 U.S. at 321, 42 L. Ed. 2d at 504, 95 S.

Ct. at 474.) In this case, no TLI supervisor presided over the daily activities of plaintiff and his fellow crew members. Indeed, none were even present. While the evidence does show that the three-member crews were largely self-sufficient in performing their duties, some degree of supervision was nonetheless required. If not supplied by TLI supervisors, then who? Construing the evidence in the light most favorable to plaintiff, as we must under the posture of this case, we believe a jury could respond to that question by answering with the name of IC.

This evidence shows that TLI crew members reported directly to the IMX yard each day to begin work and not to any TLI facility. Crew members punched in on an IC time clock and thereafter received their daily work assignments. The amount of IC's daily rail volume and the existence of IC time deadlines dictated whether and when breaks and lunch were taken, and whether overtime was required. IC employees assured that such deadlines were met. Crew members utilized expensive IC equipment in performing their tasks. Prior to any train leaving the yard, IC employees inspected the crew members' work. If mistakes had been made, IC employees directed and oversaw their correction. No TLI supervisor intervened during this process; none could, for they were not present. Crew members considered their actions to be the subject of IC control.

We believe the record evidence presented a factual question on the issue of whether IC controlled or had the right to control plaintiff's activities to render plaintiff an IC employee for FELA purposes. On appeal, IC urges that the relevant inquiry requires this court to focus on whether such control existed at the time plaintiff was riding on the spotter truck, and not while plaintiff performed loading and unloading operations. While we agree with IC's argument as to the relevant time of inquiry, we believe a question of fact nevertheless exists.

The question of employment is for the jury on the basis of all relevant information. (*Ward v. Atlantic Coast Line R.R. Co.* (1960), 362 U.S. 396, 4 L. Ed. 2d 820, 80 S. Ct. 789.) This inquiry extends not only to controlling the employee's actions but also the right to control those actions as well. (*Kottmeyer v. Consolidated Rail Corp.* (1981), 98 Ill. App. 3d 365, 374, 424 N.E.2d 345, 353; Restatement (Second) of Agency §220(1), at 485 (1958).) In considering the right to control, all of the surrounding circumstances must be considered. *Kottmeyer*, 98 Ill. App. 3d at 374, 424 N.E.2d at 353.

Here, apart from the evidence detailed above, plaintiff presented evidence to show that IC controlled or had the right to control how

plaintiff and his fellow crew members communicated themselves to and from the IC office to the location in the railroad yard where the unloading operations were to occur. First, no TLI supervisor was present to oversee crew members' activities, including how they moved about the yard. Again, if TLI supervisors were not present to supervise crew members, then who? Second, crew members walked or used IC vehicles to transport themselves. Finally, plaintiff presented evidence that not only did IC supervisors know of the riding on the back of spotter trucks prior to plaintiff's injury, Stokes testified that IC supervisors had directed him to carry crew members on the back of his spotter truck to locations in the yard. We conclude that this evidence, when combined with the evidence discussed above, was sufficient to raise a jury question on the issue of whether IC controlled or had the right to control crew members' method of communication between the IC office and the yard. (Accord *Kottmeyer*, 98 Ill. App. 3d 365, 424 N.E.2d 345 (directed verdict on employee issue properly denied where sufficient evidence existed to present issue to jury).) Even the Court's opinion in *Kelley*, which "bristles with broad hints that a finding of FELA coverage [on remand] would be clearly erroneous" (*Kelley*, 419 U.S. at 333, 42 L. Ed. 2d at 480, 95 S. Ct. at 511 (Stewart, J., concurring)), ultimately reversed and remanded the case to the district court for it to reexamine the record in light of the proper legal standard.

For the foregoing reasons, we reverse the order of the circuit court of Cook County granting summary judgment to IC, and remand the case to the circuit court for further proceedings.

Reversed and remanded.

CAMPBELL and MANNING, JJ., concur.