(No. 64331.

HENRY PUTTMAN, Appellee, v. MAY EXCAVATING COMPANY, Appellant.

*Opinion filed September 21, 1987.*

108

CUNNINGHAM, J., took no part.

Wm. Kent Brandon and Bruce E. Warren, of Mitchell, Brandon & Schmidt, of Carbondale, for appellant.

Serkland & Muelhausen, of Chicago (James C.

Serklund, of counsel), for appellee.

JUSTICE SIMON delivered the opinion of the court:

Who was in charge? That is the principal question in this action.

On September 14, 1981, plaintiff Henry Puttman, while employed by S. M. Wilson Construction (Wilson), was injured when some dirt from a ditch he was working in collapsed. He filed suit in the circuit court of Jackson County against May Excavating Company, alleging in one count a violation of the Structural Work Act (Ill. Rev. Stat. 1985, ch. 48, par. 60 *et seq.*) and common law negligence in a second count. Based on the deposition testimony of several witnesses, the circuit court granted the defendant's motion for summary judgment on both counts. The appellate court, with one justice dissenting, reversed in an unpublished order pursuant to Supreme Court Rule 23 (87 Ill. 2d R. 23; 145 Ill. App. 3d 1171). We granted the defendant's petition for leave to appeal. 103 Ill. 2d R. 315.

Count I states that the defendant served as a subcontractor to the plaintiff's employer on a construction project in Carbondale. It alleges that the defendant caused the digging of a ditch at the site and was in charge of the phase of the work being performed by the plaintiff. The complaint charges the defendant with violating the Structural Work Act by failing to erect a support to protect the plaintiff, failing to ascertain that the ditch was sufficiently stabilized to withstand collapse, and failing to stabilize the ditch. Count II alleged the defendant's negligent failure to stabilize and negligent failure to warn the plaintiff of the danger of collapse. Two questions are presented: (1) Was summary judgment for the defendant on count I proper because it was not a party "having charge of" the work for purposes of liability under the Structural Work Act? (2) Was summary judgment

for the defendant on count II proper because May Excavating had no duty of care with respect to the plaintiff?

The plaintiff's employer, Wilson, was hired to construct a hospital addition. During an earlier phase of the construction, Wilson had entered into a written contract with May Excavating to perform the mass excavation of a basement. That work had been completed prior to the incident at issue here. Plaintiff's injury occurred during the laying of a new sewer line. Two backhoes owned by the defendant were digging and backfilling a ditch, and the plaintiff was a laborer working in the ditch. Wilson employed a "top man," whose sole duty was to watch the bank and warn the laborers in the ditch if collapse was imminent. No shoring was used to support the ditch. During these operations, some dirt collapsed, and the plaintiff was partially covered.

Charles May, the sole owner of May Excavating, and Larry Williams, Wilson's job superintendent, both stated that the defendant's work under the written subcontract was limited to the excavation of the basement, which had already been completed. With respect to the sewer line, May Excavating had simply rented out the backhoe equipment and two operators (along with a truck and driver) on an hourly basis. Williams testified, and Charles May agreed, that Williams had all responsibility for determining what the operators did and how the equipment was used, for directing and supervising the work, and for job safety. May could not issue work orders or stop the work, and May Excavating's "only connection with the job" was that it furnished the equipment and operators. Williams and May both testified as well that Williams had the authority to discharge the operators from the job if he was dissatisfied with their performance.

The backhoe operators, Charles Cagle and Robert Taylor, also expressed their understanding that May

"didn't have anything to do with the job. His machinery was rented out by the hour to S.M. Wilson." Both stated that Larry Williams was the boss for the duration of the project and could have discharged them. Neither would have accepted an order from Charles May if he had purported to give one because "it wasn't his job." At no time, however, did May attempt to give orders, direction or supervision to either Cagle or Taylor. The plaintiff also testified that Williams was the "guy" who gave the orders to the workers, including the backhoe operators.

Charles May came by the worksite two or three times a week. May testified, and Cagle agreed, that May's standard practice when he leased equipment was to make sure the equipment was performing adequately and to see if the men needed anything. May also stated that he might have looked at the operators' work and that he "normally would *** look at some of their work to see if it was good work or bad work"; if they had done something wrong he probably would have told them and Williams. May conversed with Williams, who was a friend of his, on the jobsite. The operators came by May's office at night to turn in their hours and to get paid, and they would discuss any problems at that time. The operators' wages came out of the money paid by Wilson to May Excavating.

May testified that he thought the ditch was too deep not to have proper shoring, although he had not seen the caved-in section prior to its collapse. The operators did not recall it, but May thought he had talked with them about the possible need for shoring and suggested they bring it up to Williams. He did not have any blueprints, nor did he have any responsibility for seeing the ditch was properly constructed. The plaintiff and the two operators recalled that the day after the accident May brought a cage—a safety device to protect laborers in the ditch—to the worksite. Cagle believed that Williams

had called May and asked him to bring it over. Taylor recalled that the cage was never used because the laborers did not want to use it.

Liability under the Structural Work Act may fall only upon a person or entity "having charge of" the work. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305; Ill. Rev. Stat. 1985, ch. 48, par. 69.) This court has not offered a comprehensive definition of the phrase "having charge of" (see *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316), but it is clear that if the defendant's only connection with the sewer line project was to furnish equipment and operators who were to work under the sole direction of Wilson's job superintendent, it was not in any sense in charge of the work. (See *Huckabee v. Bell & Howell, Inc.* (1970), 47 Ill. 2d 153 (defendant which supplied possibly defective scaffold not in charge of the work).) The plaintiff argues, though, that the evidence does not foreclose a conclusion that the defendant had a more substantial connection with the work, and thus contends that summary judgment was inappropriate.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).) The court's task on such a motion is not to resolve a disputed factual question, but rather to determine whether one exists. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) In this case we must decide whether there is sufficient evidence to raise a jury question on whether May Excavating had charge of the work. See *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376.

The appellate court's decision finding summary judgment inappropriate was premised in part on its misunderstanding of the record. It believed that "Williams stated in his deposition that he contracted with May on

behalf of S.M. Wilson to have the excavation done for the sewer system." If this were accurate, summary judgment could not have been entered in the defendant's favor. But there was no such testimony. Williams clearly stated that there had been a prior contract for the defendant to excavate the basement during a different phase of the project, but that May's only connection with the sewer line was that he furnished the equipment and operators to Wilson under an hourly rental agreement.

The appellate court also relied on, and the plaintiff urges here, several factors outlined in earlier cases under the Structural Work Act to determine if the defendant had charge of the work (see *Chance v. Collinsville* (1983), 112 Ill. App. 3d 6). For example, the plaintiff notes that the backhoes were owned by May Excavating and that May was familiar with excavation and shoring procedures. He also asserts that May had the right to stop the work or terminate the operators' employment, that May participated in activities at the worksite, exercised supervision and control or at least retained the right to do so, and was responsible for employee safety. We have reviewed the record and conclude that each of these factors is either unsupported by any evidence or the evidence could not justify an inference that the defendant had charge of the work.

The backhoes were owned by the defendant, and defendant was in the excavation business. These facts, though, cannot be detached from the context of the undisputed direct testimony. Each witness with knowledge of the arrangement between Wilson and the defendant stated that May Excavating had rented the equipment and provided the operators to Wilson for an hourly fee. In light of this testimony, a jury could not properly infer from defendant's ownership of the equipment or his knowledge of the business that he had charge of the work.

There is simply no evidence to contradict the direct statements of Williams and May that May could not stop the work. May did not testify, as the plaintiff suggests, that he would have told Wilson's employees if he had noticed something done incorrectly; he only stated that he probably would have told his own employees if they had done something wrong. A jury could not possibly conclude from this comment that May had the authority to stop the work. The plaintiff also mentions that, on an occasion unconnected with the accident, one of the backhoe operators suggested that the plaintiff get out of the ditch. Plaintiff conveniently ignores the operator's further testimony that when the plaintiff did not get out of the ditch, the operator asked the labor steward to tell him to do so, indicating that the operators had no authority to give any orders. In any event, any advice proffered by the operator cannot justify the conclusion that May had the right to stop the work.

Contrary to the plaintiff's argument, there was no testimony that May could fire the backhoe operators from the job; rather, the undisputed evidence was that Williams could discharge them. In light of the other evidence, even assuming that May could fire the operators during the project, that fact would indicate only that he retained the right to protect his equipment and business reputation, not that he was in charge of the project.

The plaintiff also argues that May's visits to the jobsite and his furnishing of a safety cage following the accident would permit the inference that he constantly participated in the work or exercised supervision or control. Again, the plaintiff attempts to wrench the evidence from its context. While May did bring the cage to the worksite for the protection of the employees in the ditch (not his operators), he apparently did so in response to a request by job superintendent Williams. In addition, the cage was never used because the laborers did not want

to use it. This undercuts any suggestion that providing the cage represented an act of supervision or control by May. The plaintiff is also incorrect in suggesting that the testimony of operator Taylor demonstrates that May was responsible for safety on this project. In context, Taylor only stated that May enforced OSHA requirements on jobs he was supervising and that May was concerned with the operators' safety.

May did visit the jobsite two or three times a week, checked on his workers and equipment, and might have looked at some of the work to see if it was good or bad. However, this was May's standard practice when he rented out equipment and none of it is inconsistent with the testimony that May had no other connection with this job. No jury question was raised by the evidence in view of the consistent testimony of Williams, May, Cagle, and Taylor that May had no authority to participate in, supervise or control any phase of the work.

The fact that May believed the ditch could have used shoring and suggested to his operators that they mention it to Williams does not support the plaintiff's position. May's powers of observation could hardly be suspended while he was at the project site, but tellingly he issued no directives and at most advised the operators that they might talk to the job superintendent.

The trial judge correctly held that there is no genuine dispute as to any material fact on the Structural Work Act claim. The evidence showed that May Excavating merely leased the equipment and provided the operators to Wilson and that Wilson's superintendent had sole direction and control over the work. Plaintiff does not suggest, and the evidence would not warrant, a finding that the defendant was vicariously liable based on the theory that the operators had charge of the excavation. Williams testified that he made all decisions as to what the

operators did and how the equipment was used. Consequently, the defendant did not have charge of the work.

Our conclusion requires judgment for the defendant on count II of the complaint as well. The plaintiff claims that the defendant negligently failed to provide adequate shoring or stabilization and failed to warn the plaintiff of the danger of collapse. Necessary to any recovery based on negligence is the existence of a duty to conform to a certain standard of conduct for the protection of the plaintiff. (*Barnes v. Washington* (1973), 56 Ill. 2d 22, 26.) Since the defendant had simply furnished the equipment and operators, however, he had no duty to take any of the actions suggested in the complaint to protect the plaintiff. The complaint does not allege May's vicarious liability for negligent omissions by the operators, but even if it did the defendant would be entitled to summary judgment on this record because there is no evidence suggesting that the operators had independent authority to take any action.

For the reasons stated, the judgment of the appellate court is reversed and that of the circuit court of Jackson County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.