PETER J. SIKLAS, Plaintiff-Appellant, v. ECKER CENTER FOR MENTAL HEALTH, INC., Defendant-Appellee (Peter Chase, Defendant).

Second District   No. 2—92—0504

Opinion filed July 29, 1993.—Rehearing denied August 27, 1993.

David S. Pochis and Alan D. Katz, both of Chicago, for appellant.

Manuel Barbosa, of Elgin, and Paul G. O'Toole and Robert B. Baal, both of Baal & O'Connor, of Chicago, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, Peter Siklas, appeals from an order granting summary judgment to defendant, Ecker Center for Mental Health, Inc. (Ecker), in this negligence action. Plaintiff contends the trial court applied incorrect law and erred in finding for the defendant on the issue of duty.

The facts, as gleaned from the pleadings, admissions, depositions, exhibits, and affidavits, are as follows. Ecker was a not-for-profit corporation which offered a variety of services for the mentally ill. Plaintiff, who had a history of mental illness, indicated that he had been diagnosed as a paranoid schizophrenic. Upon release from his most recent hospitalization, in October 1987, plaintiff lived at home with his parents and siblings. Ecker first interviewed plaintiff and his parents the following April. According to the report of that interview, plaintiff sought the aid of Ecker because he wanted to get away from home and get an apartment and a job. Although he was currently under the care of a psychiatrist at a different mental health center, he wanted to obtain all his psychiatric services at Ecker. Plaintiff was assigned by Ecker to a psychiatrist, a therapist, and a case manager. He also began attending day-treatment groups.

In mid-May plaintiff was referred to Respite Care Center (Respite Center), an Ecker facility where patients could be admitted on a voluntary basis if they needed to be supervised or monitored around the clock for any reason. Plaintiff was referred to the Respite Center in order to determine if he was a suitable candidate for Ecker Center housing. While plaintiff was still living at the Respite Center, his case manager, Dan Byars, drove him around to look at apartments. Byars also referred him to Chris Elliott, one of the landlords from whom Ecker rented a number of apartments as part of its residential services program. Early in June plaintiff moved into one of Elliott's two-bedroom units. The apartment was already occupied by Peter Chase, another client of Ecker. As best Byars

could recall at his deposition, in looking for suitable housing for plaintiff, he made a determination that plaintiff would be compatible with Chase. The agreement whereby Ecker provided residential services specifically provided that case managers would attempt to place a client with the most compatible roommate. It was standard procedure for a case manager of one client to coordinate with the case manager of another client prior to making arrangements for the two clients to share housing. Under that procedure, Byars would have conferred with Chase's case manager, Lisa Gray, and the two of them would have determined that plaintiff and Chase could live together satisfactorily.

Plaintiff moved in with Chase some time early in June 1988. The record indicates that Ecker caseworkers regularly visited the apartments of patients who were in the Ecker residential services program. They not only inspected for cleanliness and the safety of the living quarters, but also checked the clients' mental status and determined whether they were taking their medications. Also, as part of the housing arrangement, each client agreed to participate in all phases of the individual treatment plan worked out for him or her by Ecker.

In addition to helping him locate housing, Byars assisted plaintiff with matters involving money management and public aid and social security entitlements. Specifically, in December 1988, upon plaintiff's request, Byars helped plaintiff fill out the paper work to have the payee on his social security checks changed from his mother. Plaintiff wanted the checks in his own name, but, after some discussion, he and Byars agreed that Ecker Center should be the payee. They also worked out a budget for plaintiff to live on after the change was made. In March 1989, Byars helped plaintiff set up a direct deposit for his social security checks. Plaintiff could then withdraw money, provided an Ecker employee also signed the withdrawal slip.

During the time plaintiff lived in the apartment with Chase, he continued to see Byars as well as his therapist and psychiatrist, either on a regular or as-needed basis. In September 1988, Byars reported that plaintiff appeared to be fairly well adjusted to living in his apartment and with his roommate. According to a December 1988 report there had been some issue concerning a door and window left open in the apartment. Byars talked to plaintiff, Chase, and the landlord about the problem.

Toward the end of 1988 Ecker decided to discontinue its apartment leasing program. According to the deposition of Kay Edle-

beck, director of case management services for Ecker, she told Chris Elliott he would need to make arrangements directly with the clients if he chose to lease to them and they chose to stay in their respective apartments. Dan Byars' monthly summary for January 1989 indicates that he discussed this change with plaintiff and explained to plaintiff how he could make rent payments directly to the landlord in the future.

In the spring of 1989 Ecker became aware that plaintiff's condition was deteriorating and that he was not getting along with his roommate, Chase. In May Dan Byars reported that he told plaintiff he should go to Respite Center, but plaintiff at first refused. Byars also spoke to plaintiff's parents, but they were not willing to have plaintiff live with them. Plaintiff finally did go to Respite Center on May 26, but stayed only three or four days.

Chase's case manager, Lisa Gray, similarly reported that Chase came to her several times during May about problems with plaintiff. As Byars did to plaintiff, Gray suggested, among other options, that Chase go to Respite Center until the problem was resolved, but Chase declined.

Chase had been assigned by Ecker to Dr. Franklin for psychiatric care. In the report of an interview on May 16, 1989, Dr. Franklin stated that Chase was under great stress from his roommate, who was not taking his medication, was keeping Chase up at night, and, in Dr. Franklin's words, was apparently operating in a psychotic manner. Dr. Franklin added: "The patient is barely able to handle his anger at his apartment-mate, and he also fears that in retaliation he may be physically hurt." The doctor also told Chase he could ask plaintiff to move and assume the full responsibility for the apartment. On June 6, 1989, Dr. Franklin reported that Chase had lost his job because of being upset and explained: "He is enraged with his roommate and hit him once. He came in requesting sleep medication because his roommate is up all night shuffling around and talking in a loud voice. *** He also has feelings about leaving any conflict and stated that his mode is to fight rather than engage in flight." At his deposition Dr. Franklin indicated that, after the May 16 interview, he became worried about plaintiff and Chase being a "bad mix," and he did not think they should remain roommates. He indicated that he relayed these concerns to Ecker personnel "more than once, possibly more than twice, possibly more than three times."

Early in June, Byars visited plaintiff's apartment and found him arguing with Chase. Byars again offered plaintiff the opportunity to

go to Respite Center, without success. Over the next few days plaintiff and Byars began actively searching for a new apartment for plaintiff. As of June 15 they agreed that by the end of the month plaintiff would move, either into a new apartment or to Respite Center. During the same early June time period, Chase again expressed concern about plaintiff to Lisa Gray and again refused Respite Center. Gray made home visits to the apartment shared by plaintiff and Chase on June 5, 8, and 22. Later on the same day as the last of these visits, June 22, 1989, an altercation took place between Chase and plaintiff. During the fracas Chase grabbed a knife and plaintiff was seriously injured.

At his deposition plaintiff claimed that Chase had attacked and cut one of his friends with a knife in April 1989. He also asserted that, towards the end of May, Chase physically attacked him and pulled his phone out of the wall. Dan Byars had a recollection of an incident involving Chase and a third party at the apartment but did not remember anyone being cut or injured. Byars did not recall any other incidents of physical confrontation between Chase and plaintiff. When Chase was questioned about the confrontation with plaintiff's friend, he said he felt threatened by the friend and used a pocket knife to persuade him to leave the apartment. He denied cutting the friend. Chase also denied any arguments or quarrels involving physical encounters with plaintiff prior to the June 22, 1989, incident when plaintiff was injured.

Plaintiff filed a complaint against Ecker for damages, alleging essentially that Ecker undertook generally to supervise, counsel, and control plaintiff and Chase with regard to certain life activities and further undertook specifically to arrange for roommates for each of them and to monitor the activities of the roommates. The complaint asserted that Ecker negligently or willfully and wantonly (1) failed to warn plaintiff of Chase's violent propensities, (2) failed to protect plaintiff from injury by removing either him or Chase from the apartment, and (3) failed to prevent Chase from using the knife to injure plaintiff. Ecker subsequently filed a motion for summary judgment asserting that it had no duty to protect the plaintiff from the criminal acts of a third party. Following a hearing on the motion, the trial court found that there remained no genuine issues of material fact and that, as a matter of law, Ecker had no duty to remove plaintiff or Chase from the apartment or to otherwise interfere with plaintiff's or Chase's housing decisions. The court granted Ecker's motion for summary judgment, and plaintiff timely filed this appeal.

A motion for summary judgment should be granted when the pleadings, depositions, admissions, and affidavits reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c); *Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 420-21; *Lang v. Consumers Insurance Service, Inc.* (1991), 222 Ill. App. 3d 226, 239.) Summary judgment, however, is a drastic remedy, and it should be granted only when the right of the moving party is clear and free from doubt. (*Logan v. Old Enterprise Farms, Ltd.* (1990), 139 Ill. 2d 229, 233; *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) The evidence must be strictly construed against the party seeking summary judgment and liberally in favor of the opponent. (*Logan*, 139 Ill. 2d at 234; *Lang*, 222 Ill. App. 3d at 239.) We examine the facts of this case in light of these fundamental principles.

Plaintiff's complaint sounds in negligence. In an action for negligence the plaintiff must set out sufficient facts establishing the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from the breach. (*Wojdyla*, 148 Ill. 2d at 421; *Vesey v. Chicago Housing Authority* (1991), 145 Ill. 2d 404, 411.) With regard to the element of duty, the plaintiff must show that the defendant was under an obligation to conform to a certain standard of conduct for plaintiff's protection. (*Puttman v. May Excavating Co.* (1987), 118 Ill. 2d 107, 116; *Collins v. Mid-America Bag Co.* (1989), 179 Ill. App. 3d 792, 794.) Whether under the facts of a case there is a relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of the other is a question of law to be determined by the court. (*Vesey*, 145 Ill. 2d at 411; *Rowe v. State Bank* (1988), 125 Ill. 2d 203, 215.) Whether a duty has been breached, however, is a question of fact best left to the determination of the trier of fact. *Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 163; *Coronel v. Chicago White Sox, Ltd.* (1992), 230 Ill. App. 3d 734, 736.

■ We will first dispose of plaintiff's secondary arguments since those are the only arguments to which defendant has directly responded. Ecker asserts it was not in a landlord-tenant relationship with plaintiff and therefore had no control over either plaintiff or Chase, in the sense that it could not evict or otherwise remove either one of them from the apartment. Absent control, according to defendant, it had no duty to remove Chase or plaintiff from the apartment or to otherwise restrict their activities. Defendant relies on the principle that a defendant does not owe a duty to a plaintiff

if the defendant did not control or intend to control the property where the injury occurred. (See *Simpson v. Byron Dragway, Inc.* (1991), 210 Ill. App. 3d 639, 645 (racing association, which sanctioned event but did not own or control site of racetrack, owed no duty to race car driver killed in collision with stray deer on racetrack); *Collins v. Mid-America Bag Co.* (1989), 179 Ill. App. 3d 792, 794 (defendant, a licensee whose only interest in the land was permission to use it, owed no duty to softball player injured due to holes in playing field in a park, even though defendant organized ball game).) However, as can be seen in both *Simpson* and *Collins* this rule is generally invoked where the case involves an unsafe condition of the land itself, rather than injury to plaintiff from a third party which happens to occur on the defendant's land. Nevertheless, assuming for the moment the rule is applicable here, plaintiff contends that there remained factual questions concerning Ecker's control over the apartment and that summary judgment was thereby precluded. The record, however, belies plaintiff's position. The depositions and various attachments leave no doubt that Ecker itself stopped renting the apartment well before the June incident between Chase and plaintiff. Accordingly, we agree with defendant that it is not liable on the basis that it controlled the apartment where plaintiff was injured.

■■ Ecker also asserts that no special relationship existed between itself and plaintiff whereby it was under a duty to protect plaintiff from injury at the hands of Chase. This contention reflects established principles of Illinois law. Generally, one does not owe a duty to protect another from criminal acts of third parties unless the plaintiff and defendant are in one of a very limited number of special relationships, set forth in section 314A of the Restatement (Restatement (Second) of Torts §314A (1965)) as follows: common carrier-passenger, innkeeper-guest, possessor of land-invitee, and custodian-person in lawful custody. (*Rowe v. State Bank* (1988), 125 Ill. 2d 203, 215-16; *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 559-60; *B.C. v. J.C. Penney Co.* (1990), 205 Ill. App. 3d 5, 9.) We find that none of these special relationships existed between plaintiff and Ecker, and plaintiff does not claim otherwise. Plaintiff does, however, urge that there was a special relationship between plaintiff and Ecker, sufficiently similar to those set forth in the Restatement to support the conclusion that Ecker had a duty to protect plaintiff from the injury he received. However, plaintiff does not offer any cogent reasons or convincing rationale for expanding the scope of the narrow Restatement exceptions, and we decline to

do so. In sum, plaintiff's responses to the two arguments just discussed are not persuasive that summary judgment in favor of Ecker was inappropriate. We reach a different conclusion, however, upon examination of plaintiff's primary argument.

Plaintiff contends that Ecker voluntarily undertook the duty to provide him with a compatible roommate and to monitor the living arrangements, mental status, and compatibility of both himself and Peter Chase. Having undertaken these tasks, according to plaintiff, Ecker had a duty to perform each and every one of them in a reasonable manner for his benefit. We agree and conclude that Ecker's motion for summary judgment should not have been granted.

██ One who voluntarily undertakes to render services to another is liable for bodily harm caused by his failure to perform such services with due care or with such competence and skill as he possesses. (*Vesey v. Chicago Housing Authority* (1991), 145 Ill. 2d 404, 415; *Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313, 317; *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 85-86.) Section 323 of the Restatement (Second) of Torts (1965) formulates this principle as follows:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking." (Restatement (Second) of Torts §323 (1965).)

The scope of an assumed duty is limited by the extent of the undertaking. (*Rowe v. State Bank* (1988), 125 Ill. 2d 203, 218-19; *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 209-10; *B.C. v. J.C. Penney Co.* (1990), 205 Ill. App. 3d 5, 13; *Poelker v. Macon Community Unit School District No. 5* (1990), 212 Ill. App. 3d 312, 315.) Although it is not clear exactly how plaintiff became connected with Ecker, the pleadings and the documentation offered relative to the motion for summary judgment reflect that defendant did indeed undertake to provide services to plaintiff.

██ Plaintiff had a history of mental illness, and Ecker provided services to the mentally ill. Plaintiff told Ecker his first concern was to find housing away from his family. Ecker initially placed

plaintiff in its Respite Care Center and assigned him to a psychiatrist, a social worker, and a case manager. After making a determination that plaintiff and Chase would be compatible roommates, Ecker offered plaintiff housing in one of its leased apartments, where it had previously placed Chase.

After plaintiff moved into the apartment, Ecker employees made regular visits to check on the cleanliness and safety of his living quarters. They also checked on whether plaintiff was taking his medication, monitored his general mental status, and encouraged him to keep appointments with his psychiatrist and therapist and to go to day treatment at the Ecker Center facility. Dan Byars assisted plaintiff with the management of his money as well as numerous other tasks of daily living. Home checks and the other services continued without change even after Ecker itself stopped leasing the apartments and the clients began paying rent directly to the landlord. Collectively, the evidence demonstrates that Ecker undertook to help plaintiff find and maintain suitable housing and a compatible roommate, to monitor and assist plaintiff with various aspects of his illness and treatment, and to assist plaintiff with basic life skills.

Implicit in Ecker's undertakings was the obligation to determine, insofar as possible, that plaintiff remained safe in his housing, despite his illness. Ecker monitored both plaintiff's and Chase's mental conditions. With its knowledge and expertise in the area of mental illness, Ecker could be expected to recognize changes in plaintiff's or Chase's mental health, or in the relationship between the two of them, which might arouse concern for plaintiff's safety. In our view, the services which Ecker undertook to provide to plaintiff were the kind of services which it should have recognized as necessary for the protection of plaintiff's person. Too, any failure on Ecker's part to exercise reasonable care increased the risk of harm to plaintiff, at least to the extent that Ecker had the ability to diffuse the growing tension and hostility between plaintiff and Chase. It is evident also that, due to his illness, plaintiff relied on Ecker's assistance and, ultimately, was injured in a situation substantially created and maintained by Ecker as part of its services. Consequently, under the rules regarding voluntary undertakings, Ecker had a duty to exercise reasonable care in performing those services which made up its undertaking on behalf of plaintiff.

Whether Ecker breached its duty must be determined by the trier of fact upon remand. (See *Curtis*, 98 Ill. 2d at 163.) Plaintiff asserted in his complaint that Ecker was negligent in that it failed

to warn him about Chase's propensity for violence, failed to remove him or Chase from the apartment, and failed to prevent Chase from injuring him with a knife. It is our observation after reviewing the record that many of the facts underlying these allegations are themselves the subject of conflicting evidence. Assuming, however, that plaintiff can adequately prove the relevant facts, it will be for the fact finder to decide whether, under the unique circumstances of this case, Ecker acted with reasonable care in performing the services it undertook to provide to plaintiff.

Finally, we deem it appropriate to comment on the trial court's finding that the principles of *Estate of Johnson v. Condell Memorial Hospital* (1988), 119 Ill. 2d 496, apply to this case. The *Johnson* court held essentially that a mental health facility has no duty to control a known dangerous person in order to prevent harm to others, unless the dangerous person is legally in the custody, and thus in the actual control, of the facility. The complaint in *Johnson* did not allege that the patient had been either voluntarily or involuntarily admitted to a mental health facility pursuant to the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1983, ch. 91½, par. 1—100 *et seq.*), or that an emergency petition for immediate hospitalization had been filed under the Code. Consequently, the complaint failed to allege that the dangerous person involved there had been in the custody of the hospital and, therefore, failed to allege a duty.

We fail to see how *Johnson* applies to this case. As we have discussed, plaintiff basically claims, not that Ecker failed to control Chase for his benefit, but that Ecker undertook to provide services to him and, due to the negligent performance of those services, proximately caused his injuries. Plaintiff has alleged and shown that defendant had a duty corresponding to its voluntary undertaking. Custody, of either plaintiff or Chase, is not an issue. Consequently, *Johnson* does not control the disposition of this matter.

For the reasons stated, the order of the circuit court of Kane County granting summary judgment in favor of Ecker is reversed, and this matter is remanded for further proceedings.

Reversed and remanded.

INGLIS, P.J., and UNVERZAGT, J., concur.