ANNIE P. SLAGER, as Adm'r of the Estate of David Harold Slager, Deceased, *et al.*, Plaintiffs-Appellees, v. COMMONWEALTH EDISON COMPANY, INC., Defendant-Appellant (Farmer's Grain Service *et al.*, Defendants).

First District (4th Division)   No. 1—90—3606

Opinion filed May 7, 1992.—Rehearing denied July 14, 1992.

Pope & John, Ltd., of Chicago (William R. Quinlan and Peter C. John, of counsel), for appellant.

Leonard M. Ring & Associates, P.C., of Chicago (Leonard M. Ring and Leslie J. Rosen, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Annie Slager, brought an action against Commonwealth Edison Company, Frank L. Bruss, and Farmer's Grain Service, Inc., on behalf of the estate of her deceased husband, David Harold Slager. The decedent was killed on February 8, 1982, as he left the premises of Commonwealth Edison (Edison) in his car. Striking workers were surrounding the cars of exiting nonstrikers and pelting the cars with rocks. Slager, trying to escape the situation, exited quickly and turned left onto a public highway into the path of a semitrailer truck operated by Bruss, who was employed by Farmer's Grain Service, Inc.

The jury returned a verdict in favor of defendants Bruss and Farmer's Grain Service, Inc., but also returned a verdict in favor of plaintiff and against Edison. The total sum awarded to Slager's estate, after being reduced by 40% for Slager's own negligence, was $900,000.

Commonwealth Edison appeals, arguing that as a landowner it was not liable to a person who had left the property at the time of the accident, which occurred on an adjacent highway. Alternatively, Edison contends that it owed no duty to Slager under principles of ordinary negligence and that there was no proximate causal connection between Edison's conduct and Slager's accident. Finally, Edison challenges certain jury instructions and an evidentiary ruling.

We affirm.

BACKGROUND

David Slager, a member of the pipefitters union, worked as a quality control inspector for Morrison Construction Company. On February 8, 1982, he and other Morrison employees were working at Edi-

son's nuclear power plant in Brookfield Township, which was then under construction. A few days before, two unions, the pipefitters and the laborers, had argued over who had the rights to salvage scrap pipe or plate metal on the premises. This jurisdictional dispute was not resolved and the laborers launched a wildcat strike. They erected a picket line adjacent to Edison's main gate and property line, next to the county highway, Grand Ridge Road. This main gate led to three parking lots: one for Edison's own construction workers, one for its production workers, and one for the subcontractors' construction workers. There were also exits to the northeast and northwest, but at the time of the incident they remained closed to the independent contractors and were to be used only by Edison employees.

According to trial testimony, Edison's policy was to notify local unions through the contractors that the strike was illegal and that the workers would be expected to cross the picket line. Edison employed a private security force and, in addition, worked with State and county police to keep order during strike situations. In connection with the wildcat strike activities, Edison arranged for police to be present during both shift changes, which is the time when the picket line is crossed by those workers not on strike.

The union steward for the pipefitters came to work the morning of February 8 and told the pipefitters to cross the picket line. He met with Edison's project manager for construction, Leo Burke, who assured him that the workers would have police protection when they left. Burke said he had already called the police and would do so again to make certain of their presence during the shift changes.

Before noon on the day of Slager's death, some of the picketers were drinking beer. Edison's safety coordinator for the construction site, Wayne Elens, reported this fact to Edison's construction superintendent, Dick Cosaro. Elens, who was responsible for the safety of the contractors as they entered and left the premises, testified that he felt uneasy about the strike. He asked Cosaro about opening up the east gate of the premises so that the contractors could exit the premises there instead of crossing the picket line at the main gate. Elens also discussed the possibility of letting the pipefitters off early, but Cosaro and Burke decided against it.

Two squad cars of county police were at the site most of the day, parked on the access road. Within a half hour of the afternoon shift change, however, the police told Elens that the picketers were not causing any problems and the police had decided to leave. Although Elens and Burke asked the police to stay, they left anyway. State Police arrived shortly after and Elens told them he was afraid there

might be a problem at the shift change, but as long as police were there the picketers would behave. The State Police, however, declined to stay because the county police had already left.

Edison's security company, Burns, provided 50 to 60 guards on the premises for any given shift. The guards' duties included controlling traffic. They were stationed in a watch tower in the construction lot and in a gate house by the gate that controlled access to the production parking lot.

Pursuant to an agreement between Edison and the local unions, all trade workers who were not Edison employees were required to use the main exit during labor disputes. Under the agreement, if any union employee involved in a labor dispute used one of the alternative exits, the strikers were entitled to picket those exits as well, so as to frustrate the ability of the union employees to avoid the picketers. Edison employees, however, were encouraged to use the alternative exits and thus avoid running the gauntlet of picketers.

Daniel Shamblin, an Edison employee, explained plant policy during wildcat strikes. According to him, there had been 15 prior unauthorized strikes at the plant since 1973 and, to his knowledge, no acts of violence had occurred. There is no formal written document of Edison's wildcat strike policy, but Shamblin stated that Edison expects local and county police to control the picket line. The traffic builds up around the main entrance and the police are there to facilitate "safe entrance and exit from the plant."

Written notice was posted in the service building, directing the Edison workers to leave the plant via the Marseilles Road exit. Neither the pipefitters nor other tradesmen were to leave by that exit, however. The Burns guards were instructed to tell the non-Edison employees not to use the production road, which branches off the main access road and leads to the production parking lot and alternative exit used by Edison employees.

On February 8, 1982, just before 4 p.m., Edison blew a whistle to announce quitting time. The pipefitters lined up in their cars in the construction parking lot. Because the other exits were not available for their use, they were funneled straight down the main access road leading to Grand Ridge Road, an east-west county highway perpendicular to the main access road. A stop sign was located at the edge of the main access road.

According to two pipefitters who testified at trial, there were at least 100 people in the picket line, standing across the entrance of the main access road. Vehicles were parked along the road and some of the picketers had signs or sticks in their hands. A few cars passed

through. Then the picketers started throwing snowballs mixed with rocks at the cars. Earl Warren, a pipefitter, testified that as he tried to pass, some laborers started hitting his car with sticks and clubs. Warren recognized one of the laborers and got out of his car to talk to him. Warren was hit in the jaw. He got back in his car and, when another vehicle pulled in front of him to block his exit, he turned around and drove back.

As he retreated, Warren saw his union steward, Pat Mossey, and stopped to tell him about the situation. Mossey said he would go back and call the police. Mossey told Warren to wait for the police and repeated this to some of the other pipefitters in the line. Another pipefitter, Ken Majernik, testified that he was not told that the steward was calling the police and was not told to wait for their arrival.

Two other pipefitters, Charles Bault and Mike English, waited about 5 or 10 minutes for the union steward to return. They decided to leave on their own and began driving down the access road to get to Grand Ridge. David Slager was in a car behind Bault's. Although the picketing was to take place off Edison's property, testimony indicated that at least some of the picketers were several feet north of the stop sign, on Edison property. As Bault approached the junction between the main access road and the county highway, he slowed to 5 or 10 miles an hour. The strikers were throwing things at the car and they converged on his vehicle, pushing and rocking it, and yelling and screaming. Bault passed through and turned right onto Grand Ridge Road.

As Slager pulled out behind the Bault vehicle, however, he turned left onto the highway. Just before Slager exited, someone had begun hitting the top of his car, on the driver's side, with a picket sign. Slager accelerated and turned onto the highway, directly into the path of the semitrailer truck driven by Frank Bruss. These two vehicles hit two of the cars parked on the shoulder of the road and ended up in a field adjacent to the roadway. Slager died almost immediately.

Bruss testified that as he approached the intersection of Grand Ridge Road and Edison's access road his vision was obstructed by the cars parked on both sides of the road, the semitrailer parked near the shoulder, and the snow bank piled on Edison's property as well as by the strikers who were milling around. Other witnesses said that they had no problems seeing from the access road to the county highway, and one pipefitter testified that he could see the semitrailer truck from his car, which was behind Slager's. The evidence further indicates that although Slager had been travelling slowly to the end of

the access road, he may not have come to a complete stop at the stop sign before pulling out onto the highway.

Slager's survivors include his wife and four children.

Opinion

I

NATURE OF EDISON'S DUTY

Edison's central argument is that it owed Slager no duty, either as a landowner or under any other principles of negligence. Any duty arising out of Slager's status as a business invitee ceased once Slager left the premises, according to Edison. Furthermore, Edison contends that nothing it did or failed to do on its property proximately caused Slager's fatal injuries.

Plaintiff maintains that, even apart from Edison's duty as a landowner to provide safe egress to its business invitee, Edison promised to provide for the safety of the pipefitters during the strike, inducing them to continue working, and then failed to live up to that promise.

■ The trial court instructed the jury on plaintiff's theory of ordinary negligence, rather than landowner liability. According to plaintiff, the law distinguishes between cases in which there is a dangerous *condition* on land that causes injury, and the *activities* of the owner or occupier of the land that result in harm to the plaintiff. (*E.g., Votava v. Material Service Corp.* (1979), 74 Ill. App. 3d 208, 212-13, 392 N.E.2d 768.) Edison, however, argues that because of its status as landowner, the sole basis for imposing a duty upon it must come from a determination that there was a condition on Edison's property that enhanced the likelihood of injury to Slager, and that Edison could have reasonably foreseen that the condition or activity on the land would result in injury.

In support of its position, Edison cites a treatise, W. Keeton, Prosser & Keeton on Torts §61, at 419 (5th ed. 1984) (Prosser and Keeton) for the proposition that although a landowner is under an affirmative duty to protect a business invitee against dangers that the owner might discover with reasonable care, this special obligation exists only while the invitee is upon the premises. Furthermore, there is no obligation to protect an invitee against a danger of which the invitee knows or may reasonably be expected to discover. (Prosser and Keeton §61, at 426-27.) Finally, an owner of land has an obligation to protect an invitee from the actions or negligence of third parties only when they occur on its land and when the owner has reason to believe

that such an injury would occur to the invitee based on past experience with the third party. Prosser and Keeton §61, at 428.

From these general principles of landowner liability, Edison concludes that the only duty it might have by reason of its relationship to Slager must arise from (1) hidden defects or dangers on its land of which it knew or should have discovered; or (2) its failure to exercise reasonable care for Slager during the business invitation, within the scope of the invitation, and while Slager was on Edison's property.

Before examining specific facts and cases, we note that plaintiff is propounding a duty based on Edison's negligent acts, independent of or in addition to its status as landowner. In contrast, Edison relies on that very status as the *sole* basis upon which a tort duty may arise. This dichotomy leads to strained analytical distinctions because it emphasizes black letter rules over the factual dynamics of the case. For example, by focusing on the principle that a landowner's duty to its invitee ends when the invitee leaves the property—in itself a proper and logical notion—Edison would argue that its responsibility for Slager's safety ceased once Slager's car made its turning exit from the property and passed the invisible property line of the plant. The circumstances of Slager's exit from the plant, however, demonstrate that the fatal collision was not clearly separate and divisible from what had occurred in the preceding seconds, while Slager was trying to leave the Edison property.

Decisions involving only dangerous conditions or characteristics of the land are distinguishable from the circumstances in this case. In *Ziemba v. Mierzwa* (1991), 142 Ill. 2d 42, 566 N.E.2d 1365, a case upon which Edison relies, the plaintiff sought damages for injuries he suffered while riding his bicycle on a public road past the driveway of defendant landowner. A truck that was exiting from the driveway hit the plaintiff. Thereafter, the plaintiff sued the property owner on the basis that dense foliage grew along defendant's driveway, blocking the view of approaching travelers on the road. In rejecting this theory of landowner liability, the court noted that the plaintiff never entered defendant's property or came in contact with anything on the land, which was the common law basis for a landowner's duties to travelers on adjacent highways. After reviewing prior cases holding that a landowner has no duty to maintain his property in such a way that it does not obstruct the view of travelers on an adjacent highway, the court noted that the truck driver who failed to maintain a lookout in exiting the property had been in the best position to prevent the injury. Accordingly, the court concluded that "the usual justification for impos-

ing landowner liability is not present in this case." 142 Ill. 2d at 53, 566 N.E.2d at 1369.

The pending case, unlike *Ziemba*, does not involve a landowner's duty to travelers on adjacent highways. Slager was not merely driving past the Edison plant while an exiting vehicle was negligently emerging. He was Edison's business invitee whose fatal exit from the property occurred in the wake of at least two significant facts: (1) he had been working on the premises at the behest of Edison, which gave assurances of safety; and (2) rowdy wildcat strikers were encamped along the sole exit route open to him and the other pipefitters, and Edison not only knew of that situation but also had the power to open other exits and use its own security force to control traffic. In contrast, the dispositive issue in *Ziemba* was whether the landowner's failure to defoliate the entrance to his driveway gave rise to a duty in tort to the passing traveler who was hit by an emerging vehicle whose driver failed to check traffic conditions.

Plaintiff's theory of liability does not depend upon the presence of a physical condition on Edison's property; rather, her theory centers on the actions or nonactions of Edison officials, in connection with the wildcat strike, which led to her husband's fatal injuries.

Likewise, Edison cannot rely on *Swett v. Village of Algonquin* (1988), 169 Ill. App. 3d 78, 523 N.E.2d 594, *appeal denied* (1988), 122 Ill. 2d 595, 530 N.E.2d 266. In *Swett*, three family members were crossing a highway on foot to get from a restaurant to its parking lot on the other side. A car travelling along the highway struck and killed two of the pedestrians and injured the third. The injured plaintiff sued the restaurant for failing to maintain a safe passageway between the restaurant and its parking lot. In declining to impose liability against the restaurant, the court noted that the dangerous condition from which plaintiffs were seeking protection—moving traffic on a highway—was not the type of condition on one's property that led to the finding of a duty on the part of a landowner.

In the pending case, Slager was not simply crossing a highway at the end of a noneventful day but escaping from an ugly situation that arose from the picketing of the Edison plant. Edison's main exit was the site of the striking activities and the nonpicketing workers were the target. Precisely because of the tense situation, Edison had provided assurances of the pipefitters' safety. As noted, plaintiff's theory of Edison's duty is not bottomed on its general status as landowner. Instead, she pleads the existence of a duty of reasonable care, based on Edison's promise to provide for the safety of the pipefitters after inducing them to cross the picket lines and come to work. See

*McLane v. Russell* (1989), 131 Ill. 2d 509, 514-15, 546 N.E.2d 499, 502 ("To conclude that a duty exists, a court must find that the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff"); *Castro v. Chicago Park District* (1988), 178 Ill. App. 3d 348, 352, 533 N.E.2d 504 (Imposition of duty depends, in addition to foreseeability, upon the likelihood of injury, the magnitude of the burden of guarding against harm, and the desirability of placing such burden on the defendant).

FORESEEABILITY

Edison nonetheless maintains that it is unfair to hold it responsible for what it terms a freakish accident that it could not have foreseen. Edison claims that Slager's death falls into the category of an injury that is merely possible rather than reasonably or objectively foreseeable. See *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 468, 343 N.E.2d 465, citing with approval Restatement (Second) of Torts §343 (1965), which sets forth landowners' liability to invitees based on a dangerous condition on land.

In a case involving landowner liability for dangerous conditions on its land, our Illinois Supreme Court held that a K mart store owed a duty of reasonable care to its exiting customer who foreseeably collided with a cement post outside of the door of the K mart while holding a large and bulky item. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 554 N.E.2d 223.) The fact that the plaintiff was distracted and failed to see and avoid the post did not obviate the store's duty, nor was it unforeseeable that people holding large items might ram into the post on their way out of the store.

In *Nelson v. Commonwealth Edison Co.* (1984), 124 Ill. App. 3d 655, 465 N.E.2d 513, a 10-year-old boy suffered electrical burns when a spool of copper wire he was holding came near high voltage, uninsulated power lines 30 feet above the middle of the playground in which he was playing. In finding the existence of a duty on the part of defendant, the court addressed the foreseeability issue as being determinative "only where a particular occurrence is so extreme that, as a policy decision, it would be unwise to require defendant to guard against it." (124 Ill. App. 3d at 663, 465 N.E.2d at 519.) The court added, "In the majority of cases, where varying inferences are possible from the facts, a court should permit the jury to decide the foreseeability issue, including the foreseeability of the particular cause and effect of plaintiff's injury, as a factual matter in its proximate

cause determination." (124 Ill. App. 3d at 663, 465 N.E.2d at 519.) We agree.

Foreseeability of harm, in connection with a duty, is not a magic concept that stalls common sense. (See *Robinson v. The Suitery, Ltd.* (1988), 172 Ill. App. 3d 359, 363, 526 N.E.2d 566, 568 (Foreseeability of harm " 'does not enter into the process' of critical inquiry 'into the true basis of duty' "), quoting *Zimmermann v. Netemeyer* (1984), 122 Ill. App. 3d 1042, 1050, 462 N.E.2d 502, 508.) Moreover, it is not the precise pattern of events that must be foreseeable; rather, it is the risk of harm or danger to the one to whom the duty is owed. *Filipetto v. Village of Wilmette* (1985), 135 Ill. App. 3d 781, 784, 482 N.E.2d 358 (foreseeability in context of proximate cause determination).

■ Here, Slager was one of the pipefitters for whom Edison gave assurances of safe passage across the picket line by urging the union to bring its members and by telling the union steward at the plant that the workers' safety would be ensured. The fact that Edison did call the police indicates that not only was injury foreseeable but that Edison was attempting to fulfill its responsibility for plant safety. Whether Edison personnel were negligent in failing to do more was what the jury had to decide, based on all of the facts.

Edison took steps to ensure that the wildcat strike would not interfere with its own, nonunion employees. To that end, Edison employees were encouraged to use alternative exits not available to Slager or the other pipefitters. In light of the growing tensions and lack of police presence, Edison might have issued a simple directive to let the pipefitters use alternative exits, notwithstanding the fact that the wildcat picketers could then cover those exits also. Just because strikes in the past had not resulted in serious injuries does not mean that, as a matter of law, Edison could not have foreseen present safety problems. It is not unforeseeable that bitter rivalries or resentments over union jurisdictional disputes might flare into violence.

Edison nonetheless maintains that it cannot be held liable for the unforeseeable conduct of third parties, citing *Lutz v. Goodlife Entertainment, Inc.* (1990), 208 Ill. App. 3d 565, 567 N.E.2d 477. In *Lutz*, the plaintiff unsuccessfully attempted to hold the owner of a bar liable for injuries he sustained when he bumped into a man on the dance floor. The man then struck the plaintiff. In finding the plaintiff's position untenable, the court stated that it was not reasonable to impose a duty upon the bar owner based on the overcrowded nature of the dance floor, which in and of itself did not put defendant on notice that an act of violence would occur thereon.

We do not find *Lutz* analogous to the circumstances of the pending case. The duty alleged in this case arises out of Edison's express statements, actions, and intent to provide for the safety of the pipefitters during the wildcat strike. Where such a duty is deliberately undertaken, the mere fact that there had been no history of violence in previous strikes is of limited significance. Moreover, the fact that Edison may have relied on the police for assistance does not extinguish its own responsibility. Indeed, Edison's recognition of the need for police to remain during the shift change underscores its awareness, and thus the foreseeability, of harm coming to the pipefitters through the conduct of the wildcat strikers.

We conclude that the trial court did not err in holding that plaintiff had established a sufficient basis upon which to impose a duty in this case. Edison owed Slager a duty of due care, based on the promise, assurance, or undertaking to provide for the safety of the workers who crossed the picket line. While Edison would not normally be liable for the tortious acts of other parties over whom it has no control, Edison remains responsible for those of its own negligent actions that proximately caused Slager's injuries. In this case, Edison made a series of choices or business decisions on the date of the accident. As these decisions were implemented, the pipefitters were channeled down to the point of confrontation. The evidence adduced at trial indicates that some of the picketers had crossed onto Edison's property at the time of the incident. Even if they had not, a mob of them were so near the Edison property as to block a vehicle that was trying to exit, surround that vehicle, and start rocking it, which forced it to retreat. Therefore, it is clear that the picketers were actively interfering with the safe egress of the pipefitters from Edison's property. Slager's car was hit with a board as it was trying to leave. Under the circumstances of this case, we cannot say that the trial court erred in finding that Edison owed a duty to Slager.

II

PROXIMATE CAUSE

■ As long as the duty is found to exist, moreover, such facts as the failure of Edison to allow the pipefitters to use alternative exits goes to breach of the duty and causation, questions of fact for the jury. (*Castro v. Chicago Park District*, 178 Ill. App. 3d at 352.) Although Edison asserts that this court should hold that Edison's acts or omission were not the proximate cause of Slager's injuries, as a matter of law, we decline to so hold. (See *Merlo v. Public Service Co.*

(1942), 381 Ill. 300, 317, 45 N.E.2d 665, 675 (If a party's negligence does nothing more than furnish a condition by which an injury is made possible, and a subsequent act by a third party breaks the causal connection between the original wrong and the injury, the court may be able to determine proximate cause as a question of law. However, the test in determining the question of proximate cause "is whether the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first party's own negligence").) Edison argues that the violent acts of the picketers, and Slager's own negligence, should be viewed as intervening or superseding causes of the injuries. As such, the causal connection between Edison's conduct and Slager's death would be cut off. While Edison's argument is a reasonable one to make, one which it undoubtedly argued to the jury, we believe that reasonable minds certainly can differ on the question of proximate cause in this case. The jury is not, moreover, bound to find one sole proximate cause and, indeed, there may be more than one proximate cause for an injury (*Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 88, 199 N.E.2d 769). The jury must also compare the negligence of the respective parties in making its final assessment of who is legally responsible for a given injury and to what extent. See *Filipetto*, 135 Ill. App. 3d at 785 (Adoption of comparative negligence in Illinois has diminished the need for a policy of protecting remotely negligent defendants).

We believe that Edison's various concerns and arguments were properly left for the jury's consideration. Edison was free to argue its lack of authority to control the police; its inability to open other exits or interfere with the strikers; its lack of prior experience with violent strikers; and Slager's lack of prudence in darting out onto the highway into traffic. The jury could have decided, for example, that Edison did not breach its duty because it did everything reasonably within its power to safeguard the workers. Or, it could have concluded that even if it did negligently fail to provide for Slager's safety in accordance with its assurances, Edison's failings were not a proximate cause of Slager's injury. Instead, the jury found that Edison had breached its duty of reasonable care, which proximately caused Slager's fatal injuries. The jury also held Slager 40% responsible for his injuries, thereby reducing Edison's liability. We will not second-guess the jury's verdict on properly tried issues; Edison's appeal is not based on the contention that the verdict is against the manifest weight of the evidence.

## III

JURY INSTRUCTIONS

Edison's challenge to the Illinois Pattern Jury Instructions (IPI) that were tendered on plaintiff's theory of liability must fail in light of our conclusion that the court properly found the existence of a duty under ordinary principles of negligence. The court instructed the jury under that theory. Our earlier analysis of the nature of Edison's duty reveals the flaws in Edison's challenge to the instructions. Edison simply reiterates its belief that any duty it had was premised on its status as landowner responsible for a condition of the land that caused injury. Under this argument, the trial court erred in rejecting Edison's proffered instructions that specifically framed the issues in terms of landowner liability principles.

■ We reject Edison's challenge to the instructions for the same reasons we found unpersuasive its formulation of duty. The court would have erred if it had instructed the jury on both theories, which could only cause confusion. The court instead found that the ordinary negligence instructions better fit the facts. It may be possible to view the picketing activity on or near Edison's premises as a "condition" of the land under the principles of landowner liability; in fact, plaintiff's brief contains an alternative argument supporting her recovery based on the landowner liability principles. We need not rule on the viability of this secondary theory of recovery, however, because we agree with the trial court that the ordinary negligence instructions embodied the more accurate theory under the facts. See *Piper v. Moran's Enterprises* (1984), 121 Ill. App. 3d 644, 459 N.E.2d 1382 (Trial court did not err in giving comparative negligence issues instruction on plaintiff's theory that grocery store's conduct proximately caused her injuries when she fell from a pallet on which she stood to reach a carton of root beer).

■■ ■ Likewise, Edison's challenge to the court's refusal of its non-IPI instructions on proximate cause must fail. The two refused instructions would have permitted the jury to find in favor of "the defendants" if it found that the *sole* proximate cause of the decedent's death was the conduct of the picketers or of David Slager. We agree with plaintiff that the two instructions would have improperly highlighted defendants' position on proximate cause. Because the jury received the pertinent IPI instruction for proximate cause in cases involving multiple defendants, we find no error. Finally, we hold that

the trial court properly refused as irrelevant Edison's non-IPI instruction on the constitutional right of the picketers to strike.

In light of our holding that Edison owed Slager a duty of due care and that the jury was properly instructed on the elements of the cause of action, we need not reach Edison's contention that the court improperly admitted hearsay evidence on the collateral issue of whether Slager's automobile had been travelling on the production road instead of the main access road at some point before his fatal accident.

For the foregoing reasons, we affirm the judgment entered on the jury's verdict.

Affirmed.

McMORROW and JOHNSON, JJ., concur.