641 N.E.2d 845 (1994)
267 Ill.App.3d 775
204 Ill.Dec. 415
Sharon PETERSEN, Individually, and as Special Administrator of the Estate of Ralph Jones, Deceased, Plaintiff-Appellee,
v.
U.S. REDUCTION COMPANY, Defendant-Appellant.
No. 1-91-1573.
Appellate Court of Illinois, First District, First Division.
June 6, 1994.
Rehearing Denied November 14, 1994.
Dissenting Opinion on Denial of Rehearing November 14, 1994.
*847 Baker & McKenzie, Chicago (Francis D. Morrissey, Thomas F. Tobin, Michael A. Pollard, Barrie L. Brejcha and Maureen P. Fitzgerald, of counsel), for defendant-appellant.
Demos & Burke, Chicago (William J. Burke, of counsel) and David A. Novoselsky & Associates (David A. Novoselsky, of counsel), Chicago, for plaintiff-appellee.
Justice Buckley's Dissenting Opinion on Denial of Rehearing November 14, 1994.
Justice O'CONNOR delivered the opinion of the court:
On August 6, 1982, a sniper shot and killed Ralph Jones as Jones drove his truck three miles away from a picket line he had crossed at the East Chicago, Indiana plant of defendant, U.S. Reduction Company (USR). Thereafter, Jones's wife, Sharon Petersen, filed this wrongful death action against USR. A jury found USR guilty of negligence in failing to warn Jones that it had received threats to shoot replacement drivers it had hired to work during the strike and awarded Petersen $2.25 million in damages. USR appeals the judgment.
USR is a manufacturer and supplier of molten aluminum. USR's corporate office is located in Lansing, Illinois. In 1982, its primary operation plant was located in East Chicago, Indiana. On August 4, 1982, USR union truck drivers went on strike. Because a nation-wide recession was occurring at the time, USR decided to continue operations, so as to avoid losing business to competitors. To that end, USR entered into a shipping agreement with Cardinal Transport (Cardinal), an Illinois corporation, which possessed an interstate shipping license. Cardinal leased a small fleet of trucks belonging to Coleman Movers (Coleman), an Illinois corporation. Coleman also provided drivers to drive the trucks to deliver USR's product to its customers. Ralph Jones was a Coleman driver.
As part of its agreement with Cardinal and Coleman, USR agreed to compensate Coleman for any personal injury or property damage its trucks or its drivers incurred crossing the picket line. USR requested the East Chicago, Indiana police to maintain a presence at the picket line. In addition to its own in-house security force, USR hired a private security firm, Industrial Security Management (ISM) to escort the replacement drivers from the USR plant to their ultimate destinations in Wisconsin.
Prior to the strike, USR had implemented a strike plan governing plant operations and the documentation of "incidents" during the strike. At trial, USR witnesses provided somewhat conflicting testimony as to whether the strike plan was a written one. No such plan appears in the record. Barry Brock, Director of Human Resources for USR in 1982, testified that there was a written strike plan; however, no other USR witness recalled seeing a written strike manual.
USR officials who testified about the strike plan agreed that "incidents" during the strike were to be recorded by affidavit, through a chain of command, so that those who "needed to know" would be informed. There is no evidence in the record that USR and Coleman or Cardinal had any written or verbal agreement that USR would inform Coleman of specific incidents that occurred, such as threats to shoot Coleman's drivers or of unconfirmed reports that gunshots had been fired at the plant during the strike. Rather, USR officials testified that its strike plan did not include notifying the truckers of such incidents. The only agreement USR apparently made with the truckers was to provide the security escort, ISM.
Brock testified that under USR's strike plan, Al Super, USR's vice-president of transportation, was to be notified of incidents that affected the replacement drivers and that it would be his responsibility to relay the information on a "need to know" basis. During his testimony, Brock was asked a series of hypothetical questions concerning USR's strike plan. In response, Brock stated that if Super was not notified of any actual gunshots fired, it would constitute a "failure" of the plan. However, the plan would not require affidavits documenting uncorroborated reports of gunfire to be reported to Super or to anyone else.
*848 Brock also testified that in his experience with labor disputes, "threats of doing various forms of violence to people are customary." One week prior to the strike, Carey Proctor, Jr., a USR union employee, told Michael Sertich, a USR vice-president, that if USR operated during a strike, "we'll shoot the motherfuckers." However, Sertich testified that Proctor was drunk at the time, and so he considered the threat to be an intimidation tactic. On the day the strike was announced, Sertich received a second threat from John McClinton, a union official, who threatened action similar to Proctor's. Because of McClinton's position, Sertich took the threat seriously, and filled out an incident report and disclosed the incident to the plant manager. USR never communicated these threats to ISM, Cardinal or Coleman.
The strike began at 11:01 p.m. on August 4, 1982. A picket line formed at the plant entrance, and the usual picket line activities of yelling and rock and bottle throwing commenced. At approximately, 2:30 a.m. on August 5th, Scott Reynolds and Ansel Beatty, two USR management employees, reported that they saw an individual approach the USR grounds and fire two shots. The alleged gunshot incident was immediately reported to East Chicago Police. Also, Reynolds and Beatty filled out affidavits detailing the incident. George Wise, the head of ISM, testified that an ISM guard was stationed at the location of the purported gunshots, but did not report any shots although it was his job to do so. The guard did not testify. The incident was not reported to ISM, Cardinal, or Coleman. No further incidents were reported on August 5th.
Shortly after midnight on August 6, 1982, James Purvis and Ralph Jones began hauling a shipment of molten aluminum from USR's East Chicago plant to Milwaukee, Wisconsin. The escorted drivers left the plant premises without incident. Approximately three miles from the plant, as the trucks passed under an overpass, shots rang out, and Jones was hit in the chest. He continued driving another mile onto a highway, where his truck overturned. The molten aluminum, which attains temperatures of approximately 1500 degrees, spilled onto the highway and caught fire. Jones attempted to escape from the truck, but he was engulfed by the flames and died.
USR contends that it is not liable for Ralph Jones's death. The judgment against it was predicated upon the trial court's ruling that because USR and Ralph Jones were in a relationship "akin to employer-employee," USR owed a duty of reasonable care to protect Ralph Jones from the shooting, which included warning him of both the threats by the strikers to shoot replacement drivers and of the uncorroborated report of gunfire on August 5th. USR maintains that it and Ralph Jones were not in any relationship giving rise to a common law duty of care. Rather, USR contends that under Pippin v. Chicago Housing Authority (1979), 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596, any duty to protect Jones was limited to the provision of security escorts, which it had contractually agreed to provide. Even so, plaintiff contends that USR, by its strike affidavit plan, voluntarily assumed an independent duty to protect the replacement drivers by warning them of any dangers that might come their way.
In order to be held liable for negligence, a party must first owe a duty of care to the injured party. (Pippin v. Chicago Housing Authority (1979), 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596). Whether such a duty exists is a question of law. (Fancil v. Q.S.E. Foods, Inc. (1975), 60 Ill.2d 552, 555, 328 N.E.2d 538). Ordinarily, a party owes no duty of care to protect another from the harmful or criminal acts of third persons. (Fancil, 60 Ill.2d at 555, 328 N.E.2d 538). However, the law recognizes at least four exceptions to this rule: (1) when the parties are in a special relationship and the harm is foreseeable; (2) when an employee is in imminent danger and this is known to the employer; (3) when a principal fails to warn his agent of an unreasonable risk of harm involved in the agency; and (4) when any party voluntarily or contractually assumes a duty to protect another from the harmful acts of a third party.
In order to resolve this appeal, we must examine each of these exceptions to the general rule against tort liability for the criminal acts of a third person, in addition to defining *849 the relationship between USR and Ralph Jones.
The first exception to the rule is the special relationship exception, as set forth in Restatement (Second) of Torts, section 314(A) (1965). Under this exception if the plaintiff and defendant are in a special relationship, the defendant owes a duty to protect the plaintiff from unreasonable risks of physical harm. Fancil, 60 Ill.2d at 559-60. 328 N.E.2d 538.
Section 314(A) enumerates four special relationships giving rise to the duty: (1) carrier-passenger; (2) innkeeper-guest; (3) business inviter-invitee; (4) custodian-protectee. (See also Fancil, 60 Ill.2d at 559-60, 328 N.E.2d 538). Plaintiff concedes that the relationship between Ralph Jones and USR does not satisfy any of these criteria. Nonetheless, she maintains that the trial court correctly ruled that Jones and USR had a special relationship "akin" to those enumerated in section 314(A), such that USR owed him the duty stated therein.
Although the drafters of section 314(A) "expresse[d] no opinion as to whether there may not be other relations which impose a similar duty," Illinois courts have been extremely reluctant to expand the scope of section 314(A) beyond the four enumerated relationships. (See Rowe v. State Bank of Lombard (1988), 125 Ill.2d 203, 126 Ill.Dec. 519, 531 N.E.2d 1358). In Siklas v. Ecker Center for Mental Health (1993), 248 Ill. App.3d 124, 187 Ill.Dec. 299, 617 N.E.2d 507, the plaintiff was an outpatient with defendant. In conjunction with its treatment services, defendant offered housing placement services and, based upon its conclusions as to compatibility, placed plaintiff in an apartment with a roommate who was also an outpatient. The roommate later stabbed plaintiff. The plaintiff there argued, as does plaintiff here, that the relationship between him and the defendant was "sufficiently similar" to those set forth in the Restatement and thus supported the imposition of a duty to warn plaintiff of his roommate's dangerous propensities. The court rejected the claim, holding that plaintiff had offered no "cogent reasons or convincing rationale for expanding the scope of the narrow Restatement exceptions." Siklas, 248 Ill.App.3d at 130, 187 Ill.Dec. 299, 617 N.E.2d 507.
Relying on Ozment v. Lance (1982), 107 Ill.App.3d 348, 63 Ill.Dec. 281, 437 N.E.2d 930, plaintiff contends that we should expand section 314(A) because USR's relationship to Jones was similar to that of employer-employee, a relationship referred to in comment "a" to section 314(A) as one giving rise to a duty similar to that imposed by section 314(A). However, Ozment did not hold that the employer-employee relationship was a special one for purposes of section 314(A). Rather, the Ozment court merely assumed the relationship was a special one for purposes of its analysis. Furthermore, comment "a" to section 314(A) does not state that section 314(A) governs such duties; rather, it directs us to the duty imposed by the Restatement (Second) of Agency, section 512(1) (1958). Because Ozment omitted reference to the Restatement of Agency in its analysis, we find it unpersuasive for purposes of ours. To the extent we will consider whether an employer owes a duty to protect an employee from the criminal acts of third parties, we prefer to do so with reference to the Restatement (Second) of Agency, which specifically addresses duties arising out of the varying relationships found in the workplace. Thus, like the Siklas court, we decline to expand the scope of section 314(A) of the Restatement of Torts under the circumstances presented here.
The second exception to the rule against tort liability for the criminal activities of third persons is found in the Restatement (Second) of Agency, section 512(1) (1958), which imposes a duty upon employers to exercise reasonable care to protect an employee who "comes into a position of imminent danger or serious harm and this is known" to the employer. (See also Dowler v. New York, Chicago & St. Louis R.R. Co. (1955), 5 Ill.2d 125, 131, 125 N.E.2d 41). Because we decide that Ralph Jones was not USR's employee, section 512(1) cannot apply in this case. However, even assuming Ralph Jones was USR's employee, section 512(1) would be of no avail to plaintiff.
*850 Comment "c" to section 512(1) suggests that the duty it imposes might require employers to "provide means of relief or rescue before the risk of harm becomes imminent." This caveat is applicable when the nature of the enterprise renders the dangers foreseeable. Comment "c" provides examples to aid our understanding of the scope of section 512(1). For instance,
"in a dangerous business in which accidents are likely to happen frequently, the employer is under a duty to make provision for some means of taking care of employees who are hurt. * * * Thus, if the master's business is the preservation for underwriters of goods in burning buildings, the master has reason to anticipate that harm may arise in the course of such enterprise and must use care to see that some means are provided for the treatment of employees who are hurt, unless he can reasonably assume that they will be supplied by others, as, for example, by firemen employed by the public." Restatement (Second) of Agency, sec. 512(1), comment c, at 479.
The drafters also included the example of a sudden illness which strikes an employee upon the work premises when the premises are located in an isolated place, which might require on-site first-aid facilities. An additional example of imminent danger requiring anticipatory measures implied by comment "c" is a fire in any work place, which might require that extinguishing equipment be provided. We do not believe that the drafters of section 512(1) envisioned that protecting against "imminent danger" would include warning of an inchoate threat that harm occasioned by the criminal act of an unidentified assailant might occur to an unspecified person at an unspecified time and location. We believe that "protection" under the Restatement encompasses such provisions as "portal to portal" security, which USR had the foresight to provide.
The third exception to the rule against liability is found in Restatement (Second) of Agency, section 471 (1958), which provides that "[a] principal is subject to liability in an action of tort for failing to use care to warn an agent of an unreasonable risk involved in the employment, if the principal should realize that it exists and that the agent is likely not to become aware of it, thereby suffering harm." (See also Dowler v. New York, Chicago & St. Louis R.R. Co. (1955), 5 Ill.2d 125, 131, 125 N.E.2d 41). The Drafters of the Restatement provide an example of the scope of section 471 which eerily reminds us of this case:[1]
"P claims title to land occupied by T, who threatens to resist by force an attempt to work on it. P employs A to work on it, not telling A of T's threats. T shoots A. P is subject to liability to A."
However, consideration of section 471 requires us first to answer a more fundamental questionone which has gone unanswered in this case and upon which the duty imposed by this exception is predicated: What was the legal relationship among USR, Cardinal, Coleman, and Ralph Jones. If Ralph Jones was an agent of USR, then section 471 governs our inquiry into the duty question, and so long as we determine that Ralph Jones faced an unreasonable risk of harm known to USR, but unknown to him, USR owed a duty to warn him of such danger. On the other hand, if Cardinal, Coleman and Ralph Jones were non-agent independent contractors, section 516 of the Restatement relieves USR of any duty which it would owe to a servant or agent. See Restatement (Second) of Agency, sec. 516 (1958).
Generally, "whether a contractor is a servant-agent (i.e. employee) or an independent contractor is an issue which focuses on the principal's right to control the manner and method in which the work is to be done. Among the indicia utilized to evaluate whether such a right to control exists are the method of payment, right to discharge, the skill required and the furnishing of tools and equipment." (Lewis v. Mount Greenwood Bank (1980), 91 Ill.App.3d 481, 487, 46 Ill. Dec. 926, 414 N.E.2d 1079). USR urges that Ralph Jones was an independent contractor. Indeed, plaintiff nearly concedes as much in her brief on appeal, though she contends that *851 because, in some respects, USR treated Jones like an employee, we should find, like the trial judge, that Jones was "akin" to an employee and impose a duty on that basis. However, the characterization of the trial court as to the relationship is not binding upon this court.
We assume that plaintiff's argument, though she has never so stated, is that Jones was an agent-independent contractor of USR. Certainly, she cannot contend that Jones was a servant-agent of USR. Indeed, under Lewis, Jones was unquestionably, the servant-agent of Coleman. Coleman paid Jones; withheld income and social security taxes from his paycheck; controlled the equipmenthis truckhe used; directed where he was to work (indeed, Stan Warwick, president of Coleman, testified that Coleman employed a dispatcher for precisely this purpose); and presumably retained the sole right of discharge over him.
Illinois courts have recognized that, under some circumstances, a person can serve two masters simultaneously. (See Kottmeyer v. Consolidated Rail Corp. (1981), 98 Ill.App.3d 365, 372, 53 Ill.Dec. 710, 424 N.E.2d 345). We have not found an Illinois case which, under its facts, has so held. Decisions from other jurisdictions which have held that an employee served two masters simultaneously have most often involved employees of temporary agencies assigned to secondary employers who exercised significantly greater control over the employee than did USR over Ralph Jones. For instance, in Goodman v. Sioux Steel Co. (S.D.1991), 475 N.W.2d 563, 565, the secondary employer enjoyed the right to discharge the temporary employee. In Whitehead v. Safway Steel Products, Inc. (1985), 304 Md. 67, 497 A.2d 803, 811, the Maryland Supreme Court emphasized that the secondary employer retained the right to discharge, as well as the right to reassign the temporary worker, without notice or approval of the temporary agency, to various tasks within its enterprise. Against this background, we conclude that Ralph Jones was neither USR's employee nor "akin" to one.
Indeed, Ralph Jones is more appropriately characterized as an independent contractor. Aside from its dictating a delivery schedule and its provision of the trailers upon which its special vats containing the molten aluminum were to be carriedan insignificant retention of control given the molten nature of the productUSR exercised little, if any, control over Coleman.
Our determination that Jones was an independent contractor does not automatically conclude our inquiry into whether he was USR's agent. However, in order to determine the duty, if any, owed to Jones, we must focus our analysis on the relationship among USR, Cardinal, and Coleman to determine whether a general principal and agent relationship existed among them.
Our courts have consistently stated that the distinguishing characteristic of an agent is that he represents another contractually. An agent, "[w]hen properly authorized,... makes contracts or other negotiations of a business nature on behalf of his principal, by which his principal is bound." (Sobel v. Franks (1994), 261 Ill.App.3d 670, 679, 199 Ill.Dec. 24, 30, 633 N.E.2d 820, 826, quoting Hoffman & Morton Co. v. American Ins. Co. (1962), 35 Ill.App.2d 97, 102-03, 181 N.E.2d 821). If the agent is authorized to do so, he may appoint sub-agents "to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." (Restatement (Second) of Agency, sec. 5(1) (1958)). In such circumstances, the principal owes the same duty to the sub-agent as to the agent. See Restatement (Second) of Agency, sec. 458 (1958).
We do not discern an agency relationship to exist between either USR and Cardinal or USR and Coleman. Neither Cardinal nor Coleman had any authority to enter contracts or other negotiations of a business nature on behalf of USR. That is, neither could bind USR contractually to a third party. The evidence supporting this conclusion was supplied at trial by Stan Warwick, president of Coleman, and Jack Riley, of Cardinal. USR contracted with Cardinal because Cardinal possessed an interstate shipping license. Cardinal could not perform the required transportation of USR's molten aluminum because it did not own trucks. *852 Coleman owned a small fleet of trucks. Therefore, Riley introduced USR's Al Super to Stan Warwick. Super conducted independent negotiations with Warwick, albeit in Riley's presence. The final arrangement appears to have been that USR contracted with Cardinal to deliver the molten aluminum. On USR's approval, Cardinal leased trucks from Coleman, whose employees included Jones. USR paid Cardinal, which paid Coleman an amount agreed to between the two trucking firms. Coleman in turn paid Ralph Jones a salary agreed to between them. Under these circumstances, we cannot but conclude that an agency relationship is wanting. Indeed, our conclusion is supported by Comment "b" to Restatement (Second) of Agency section 14(N) (1958), which states that "[a] person who contracts * * * to deliver something to another, but who is not acting as a fiduciary for the other, is a non-agent independent contractor." Thus, the duty imposed by section 471 does not apply here.
Even were we to hold that an agency relationship existed, we would find it difficult to impose the duty stated in section 471 of the Restatement. The evidence at trial revealed that replacement drivers like Jones expected to have rocks and bottles thrown at them as they drove; to have nails placed on the roadway; and to have, as they crossed a picket line, their trucks attacked by strikers wielding, among other things, baseball bats. Any of these violent activities could result in the death of a truck driver. Indeed, precisely that has occurred as demonstrated by the facts in Slager v. Commonwealth Edison (1992), 230 Ill.App.3d 894, 172 Ill.Dec. 427, 595 N.E.2d 1097, appeal denied, 146 Ill.2d 652, 176 Ill.Dec. 822, 602 N.E.2d 476. In Slager, an unruly picket line caused a replacement driver to turn the wrong way on a highway, where he collided with another vehicle and died. Although the Slager court imposed a duty on the defendant, it did so on the ground that the defendant had contractually assumed the duty to protect the independent contractors in that case.
Were the sniper who shot Ralph Jones to have been armed with a rock, instead of a rifle, and thrown the rock into Ralph Jones speeding truck, we would face almost identical facts and result, absent only the connection between the violent conduct threatened and that which actually occurred. Under those circumstances, plaintiff would not be heard to argue that USR owed any duty to the truckers beyond that which it had contractually assumed in procuring their services. That the instrumentality used to occasion the injury here was a shotgun rather than a baseball bat or a rock or a bottle sharpens our moral outrage over this despicable tragedy; it cannot, however, alter concepts of legal duty.
The contract between USR and the truckers required "portal-to-portal" security escorts, which plainly indicates that the specter of potentially serious danger was well-considered by all concerned, prior to the strike. Indeed, the truckers expected rocks and bottles to be hurled at them. Furthermore, as Barry Brock testified, threats of bodily violence are customary in a strike situation. Unlike the victim in the comment to section 471 of the Restatement (Second) of Agency, the replacement drivers here knew that they were entering a situation fraught with the potential for danger. Thus, we do not believe the risk of serious or even fatal injury to have been a hidden or concealed danger of Ralph Jones's engagement so as to impose the duty contained in section 471 and recognized in our supreme court's decision in Dowler v. New York, Chicago & St. Louis R.R. Co. (1955), 5 Ill.2d 125, 131, 125 N.E.2d 41.
Accordingly, we hold that USR owed no common law duty to warn Cardinal, Coleman, or Ralph Jones of a mere threat to shoot replacement drivers or of the uncorroborated report that gunshots had been fired at the plant during the strike.
Although the trial court did not proceed on the basis that USR voluntarily or contractually assumed a duty to warn the truckers of dangers that arose during the course of the strike, plaintiff urges us to recognize such a duty on appeal. Indeed, USR has consistently maintained that the scope of its duty in this case should be examined with regard to the contractual arrangements between it and the replacement drivers.
*853 In Nelson v. Union Wire Rope Corp. (1964), 31 Ill.2d 69, 74, 199 N.E.2d 769, our supreme court held that liability for the criminal acts of a third person can arise from the negligent performance of voluntarily undertaken duty to prevent such acts. USR contends that any voluntary undertaking in this case was limited to that described in the supreme court's decision in Pippin v. Chicago Housing Authority (1979), 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596. In Pippin, the supreme court recognized that when a landowner contracts with an outside agency to provide security to invitees, the landowner assumes a duty of care in discharging efforts to protect the invitees commensurate to the extent of the undertaking. Accordingly, the landowner can be held liable only for the negligent hiring of the security firm. Pippin, 78 Ill.2d at 208, 35 Ill.Dec. 530, 399 N.E.2d 596.
USR contends that its contractual promise to provide security for the replacement truckers required only that it hire a security firmISMto escort the drivers through the picket and on to their destination. In denying USR's motion to dismiss plaintiff's sixth amended complaint, the circuit court recognized this theory of the case as being properly pled. However, the jury was not instructed on this theory because the trial judge subsequently ruled that USR owed Jones the broader special relationship duty which we have rejected.
Plaintiff has conceded on appeal that she does not contend that USR was negligent in hiring ISM. Rather, she contends that USR undertook a broader voluntary duty toward Ralph Jones. She argues that USR, in devising its strike plan, voluntarily undertook to warn her husband of the threats to shoot the replacement drivers. Specifically, she argues that the affidavit process, whereby incidents that occurred during the strike were reported through a chain of command, demonstrated that USR intended to relay information about the threats to the drivers.
Plaintiff's contention is not borne out by the evidence. The trial testimony shows that USR's primary purpose in implementing the affidavit procedure was to gather evidence in support of its effort to obtain a temporary restraining order against the picketers, should that have become necessary. The strike plan was not a security pamphlet intended to protect employees while they were on the employer's premises, as in Vaughn v. Granite City Steel Division (1991), 217 Ill. App.3d 46, 159 Ill.Dec. 951, 576 N.E.2d 874, appeal denied 142 Ill.2d 666, 164 Ill.Dec. 929, 584 N.E.2d 141. Nor was the strike plan a "bible of security procedures," informing managers how to protect employees from known dangers. (See Martin v. McDonald's Corp. (1991), 213 Ill.App.3d 487, 157 Ill.Dec. 609, 572 N.E.2d 1073, appeal denied 141 Ill.2d 543, 162 Ill.Dec. 491, 580 N.E.2d 117). Furthermore, the strike plan was not a part of USR's agreement with either Cardinal or Coleman. As noted above, the contract between USR and the truckers required only "portal-to-portal" security escorts, which were, in fact, provided. In their testimony, neither Coleman's Stan Warwick nor Jack Riley, the chief of Cardinal, indicated that they had any knowledge of USR's strike plan, either at the time of the strike, or even at trial, for that matter. Indeed, neither mentioned the plan in his testimony. Thus, the strike plan cannot be said to have been part of the consideration that USR offered to Cardinal or Coleman to accept the job. (See Slager v. Commonwealth Edison Co. (1992), 230 Ill.App.3d 894, 172 Ill.Dec. 427, 595 N.E.2d 1097, appeal denied, 146 Ill.2d 652, 176 Ill.Dec. 822, 602 N.E.2d 476 (finding duty where promise of protection was part of inducement to cross picket line)). Under the circumstances, we conclude that USR's adoption of a strike plan was for its own purposes and not for the benefit of the replacement drivers, as required by Nelson, 31 Ill.2d at 78-80, 199 N.E.2d 769.
Our conclusion that the affidavit system was an internal plan is strengthened by the fact that, to the extent that the plan specified, USR did not undertake to notify Cardinal or Coleman of any particular incident that might occur. Although Barry Brock testified that USR's Al Super was responsible for notifying the truckers of incidents which affected their safety, to equate this responsibility to the voluntary undertaking of a duty to warn is impossible where USR did *854 not first undertake to notify Cardinal or Coleman of any particular type of incident. In Vaughn, Martin, and Slager, on the other hand, breaches of specified elements in security plans were alleged, and the courts predicated the imposition of a duty on that basis.
In addressing the issues presented in this case, we are guided by the supreme court's disposition of another case in which the criminal conduct of a third party formed the basis for allegations of civil liability. In Boyd v. Racine Currency Exchange (1973), 56 Ill.2d 95, 306 N.E.2d 39, a bank robber had threatened to kill a customer if a teller did not accede to his demands. Upon hearing this threat, the teller dropped to the floor behind a counter, and the robber shot and killed the customer. The supreme court held that the bank owed no duty to accede to the demands of bank robbers in order to prevent injury to customers. The court stressed that to do so permits a potential wrongdoer the leverage of blackmail. (Boyd, 56 Ill.2d at 100, 306 N.E.2d 39). Although we recognize the distinctions between this case and Boyd, we consider USR to have been in a position similar to, and perhaps worse than, the teller in Boyd. And, though, as the supreme court noted, "the result may appear harsh and unjust, * * * we cannot afford to extend to the criminal another weapon in his arsenal." Boyd, 56 Ill.2d at 100, 306 N.E.2d 39. Accordingly, we hold that USR owed no duty to inform Coleman or Cardinal of a mere threat to shoot replacement drivers and of an uncorroborated report of gunfire.
Reversed.
CAMPBELL, P.J., and BUCKLEY, J., concur.
SUPPLEMENTAL OPINION ON REHEARING
Justice BUCKLEY, dissents:
Upon consideration of plaintiff's petition for rehearing, I withdraw my concurrence in the majority opinion and respectfully dissent.
In my opinion, the record and case law support the duty imposed on the defendant by the trial court. In reversing the trial court, the majority focuses upon the four exceptions to the rule denying liability for the criminal acts of a third party, finding none of them applicable. I cannot agree.
I do not agree with the majority's finding that the defendant received only "inchoate" threats which did not require warnings. As plaintiff argues in her petition for rehearing, the threats were not made by unidentified assailants against unspecified persons. Defendant received threats from two individuals which were identified by name. While it may be true that the precise identity of other individuals making threats or firing shots may not have been known to defendant, it clearly knew the group making the threats and against whom those threats were madeany replacement driver.
I also do not agree that rocks, bottles, and baseball bats are in the same category of anticipated and potential projectiles or weapons as gun shots. A gun is inherently a deadly weapon; rocks and bottles are not. While one may expect violence in the nature of rocks and bottles, one would not expect to be shot for crossing a picket line. Thus, gun shots would constitute a concealed or hidden danger, particularly where defendant had received several threats and reports of gun fire on or near its premises which would mandate warnings.
I respectfully submit that defendant undertook a duty to protect and assure the safety of the replacement drivers, either voluntarily or contractually. Although the majority found that the strike plan was designed for defendant's own purposes in obtaining a TRO, I believe the plan went further to protect the safety and security of workers. Beyond the affidavit and notification processes, the plan provided for shipment and operation security, sleeping accommodations, telephone procedures, police contact and communication.
The facts and circumstances of this case are more similar to Slager than to Boyd and the cases relied on by the majority. In Slager, while a wildcat strike was underway, certain workers crossed the picket line. The defendant/company asked police officers to be present at the gates so that workers would be protected when they left. The defendant not only had its own security force *855 but also hired a private firm. It did not have a formal written document pertaining to wildcat strikes nor had the defendant experienced violence during previous strikes. At the time of this strike, the defendant had not received any threats against the workers who crossed the picket lines.
The defendant promised to provide safety to those workers who crossed the picket lines, inducing them to continue working. The defendant knew of the problems occurring at the picket line and precisely because of this situation, assured workers of their safety. Shortly prior to the accident at issue in Slager, the defendant had called the police in order to secure the gate area. According to the court, because defendant undertook security measures and phoned the police, it foresaw violence and was attempting to fulfill its responsibilities to provide safety to the workers. Based on the above, the court found that a duty arose out of defendant's express statements, action, and intentions to provide safety and therefore, a sufficient basis to impose liability on defendant existed.
The facts before us are more pronounced. Before the strike, defendant created a strike plan which included safety measures because of the violence it knew surrounded strikes. USR agreed to compensate Cardinal and Coleman for any personal injuries or property damages sustained as a result of working for it. Defendant requested police presence at the picket line in order to maintain safety. It had its own security force but also hired a private security firm to escort the replacement drivers to assure their safety. USR had received threats and reports of shootings but made a business decision not to inform or warn anyone else. Based on the actions of defendant and the facts and outcome of Slager, I believe there is a sufficient basis to find that defendant undertook a duty to provide security and safety for replacement workers and therefore, a basis for imposing liability upon it.
NOTES
[1] Indeed, we are somewhat disturbed that, apparently, in the decade-plus that this case has proceeded, no attorney has addressed section 471.